Argued and submitted June 26, 2013, remanded for resentencing, otherwise affirmed September 30, 2015, petition for review denied May 26, 2016 (359 Or 667)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**JOSEPH WORTH, JR.,**
*Defendant-Appellant.*

Multnomah County Circuit Court
060532697; A147948

360 P3d 536

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Before Nakamoto, Presiding Judge, and Haselton, Chief Judge, and Edmonds, Senior Judge.*

---

* Haselton, C. J., *vice* Armstrong, P. J.

HASELTON, C. J.

## HASELTON, C. J.

In this case, which is before us for a second time, following a retrial on remand, *State v. Worth*, 231 Or App 69, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010) (*Worth I*),[1] defendant appeals a judgment of conviction for first-degree kidnapping (Counts 1 and 2, merged), first-degree sexual abuse (Counts 4, 5, and 6, merged), first-degree unlawful penetration (Count 7), and second-degree assault (Count 8). Defendant raises diverse contentions, including an assertion that former jeopardy and double jeopardy provisions barred the retrial and convictions, as well as challenges to the denial of his motions for judgment of acquittal (MJOA) on the kidnapping charges, the admission and exclusion of evidence, and the imposition of sentence. For the reasons set out below, we reject all of defendant's assignments of error except for two relating to sentencing. Specifically, we agree with defendant that the trial court erred in calculating consecutive upwards departure sentences without adhering to the sentencing guidelines limitations on the length of those sentences. Accordingly, we affirm defendant's convictions and remand for resentencing, which obviates the need to consider defendant's further contention that the trial court unconstitutionally imposed a greater sentence than defendant had received after the first trial.[2]

We begin by summarizing the predicate events and material procedural history. Our analysis below recounts additional pertinent facts and circumstances consistently with the standard of review applicable to particular assignments of error.

On the evening of April 14, 2006, the victim, C, who was 17 years old at the time, went to a movie. As C walked

---

[1] In *Worth I*, we reversed and remanded defendant's convictions, concluding that defendant was entitled to a mistrial due to the trial court's failure to recognize and correct the prosecutor's closing argument misstatements about the presumption of innocence.

[2] *Accord State v. Partain*, 349 Or 10, 239 P3d 232 (2010) (abandoning the *per se* prohibition on an increased sentence following a successful appeal in favor of a presumption against increased sentences, which can be overcome if the reasons for imposing an increased sentence are based on identified facts of which the original sentencing judge was unaware, appear in the record, and satisfy a reviewing court that the decision to impose an increased sentence was not a product of vindictiveness).

home afterwards, she was attacked. Her assailant, who had been lying in wait at a construction site, jumped out onto the sidewalk and grabbed C. After forcing her over to the side of a building, he proceeded to choke her, put a knife to her throat, threaten her if she refused to comply with his demands, and, when she tried to escape, beat her. Her assailant then dragged C approximately eight feet into a porta-potty on the construction site, where he sexually assaulted her.

Afterwards, the assailant bound C's hands and told her not to leave for 10 minutes. Upon C reaching home, her mother immediately called 9-1-1. C then went to the hospital, where she underwent a sexual assault examination, which yielded DNA samples. During a subsequent police interview, C identified defendant as the assailant from a photo array. Defendant was later arrested and in his possession was a pocket knife bearing traces of blood that were consistent with C's DNA. Defendant was charged by indictment with two counts of first-degree kidnapping, ORS 163.235; one count of first-degree rape, ORS 163.375; three counts of first-degree sexual abuse, ORS 163.427; one count of first-degree unlawful sexual penetration, ORS 163.411; and one count of second-degree assault, ORS 163.175.[3]

Defendant's first trial occurred in February 2007. As noted above, during closing argument, the prosecutor made several improper comments about the presumption of innocence. Defense counsel objected and moved for a mistrial, but the trial court overruled those objections in material part, and denied a mistrial. *See Worth I*, 231 Or App at 72-74. The jury found defendant guilty of all charges except first-degree rape, *id.* at 74, and the court sentenced defendant to a total term of imprisonment of 485 months.[4]

---

[3] As to both first-degree kidnapping charges, the state alleged that defendant "did unlawfully and knowingly * * * take [C] from one place to another, with intent to interfere substantially with [her] personal liberty." Count 1 additionally alleged that defendant acted "with the purpose of causing physical injury to [C]," and Count 2 alleged that he acted "with the purpose of terrorizing [C]." *See* ORS 163.235(1) (setting out five alternative variants of first-degree kidnapping).

[4] The original sentencing court imposed the following consecutive Measure 11 sentences of imprisonment: 90 months on Count 1, 75 months each on Counts 4, 5, and 6 (which did not merge), 100 months on Count 7, and 70 months on Count 8. Purporting to "merge" Count 2 with Count 1 for sentencing purposes, it imposed concurrent sentences on Counts 1 and 2. *See State v. Davis*, 265 Or App 425, 433, 335 P3d 322 (2014), *rev den*, 356 Or 837 (2015) ("'[M]erger' is a concept

On appeal in *Worth I*, we reversed and remanded the convictions resulting from the first trial. We held that the comments by the prosecutor during closing argument that misrepresented the presumption of innocence, paired with the trial court's overruling of defense objections and failure to give a curative instruction, created such a potential for jury confusion "about whether the presumption of innocence extended through jury deliberations" as to deny defendant a fair trial. *Id.* at 77-79.

The proceedings and rulings that are the subject of this (second) appeal ensued. Specifically, following remand, defendant moved to dismiss the state's case on state former jeopardy and federal double jeopardy grounds, arguing that the prosecutor's improper closing argument in the first trial constituted preclusive prosecutorial misconduct. The trial court denied that motion. Before trial, defendant moved, unsuccessfully, to exclude evidence that, as defendant was leaving the courtroom following his original sentencing, he said, "I should have just killed the bitch." Defendant also unsuccessfully moved during trial to preclude the admission of inculpatory DNA evidence from the sexual assault examination, arguing that the state had failed to establish the requisite foundation for the predicate DNA identification technique. Finally, defendant sought, and the trial court denied, judgments of acquittal on the two kidnapping charges.

The jury found defendant guilty of first-degree kidnapping (Counts 1 and 2), first-degree sexual abuse (Counts 4, 5, and 6), first-degree unlawful penetration (Count 7), and second-degree assault (Count 8).[5] The jury also found various sentencing enhancement facts and dangerous offender criteria on each charge.

In the sentencing hearing following the second trial, the parties disputed a variety of issues, including, as amplified below, the applicability of the sentencing guidelines "shift-to-I," "200%," and "400%" rules. Defendant also contended that, as a matter of due process, the court could

that applies to the merger of multiple guilty verdicts into a single conviction * * *. Sentences themselves do not 'merge'; they are either concurrent or consecutive.").

[5] As noted, at his first trial, defendant was acquitted on Count 3 (first-degree rape).

not impose a sentence exceeding that originally imposed before defendant's initial, successful appeal. Ultimately, the trial court entered a judgment of conviction that (1) merged Count 2 with Count 1, yielding a single conviction for first-degree kidnapping, (2) merged Counts 5 and 6 with Count 4, yielding a single conviction for first-degree sexual abuse, and (3) included separate convictions as to Count 7 and Count 8. Based on the jury's findings of the requisite criteria, the trial court opted to sentence defendant as a "dangerous offender" pursuant to ORS 161.725 and related statutes, discussed below, thereby imposing consecutive indeterminate dangerous offender 30-year sentences on each conviction, for a total of 120 years (1,440 months). Denying all forms of early release and sentence reduction, the trial court imposed consecutive determinate sentences—that is, the minimum possible term of imprisonment—of 240 months on Count 1, 90 months on Count 4, 144 months on Count 7, and 120 months on Count 8, resulting in a minimum incarceration term of 594 months, exceeding the 485 months imposed in the original sentencing.

On appeal, defendant assigns error to (1) the denial of the motion to dismiss on former jeopardy and double jeopardy grounds; (2) the admission of his statement following the original imposition of sentence; (3) the admission of the DNA evidence; (4)-(5) the denial of the MJOAs on the kidnapping charges; (6) the imposition of a sentence allegedly in violation of applicable nonconstitutional limitations (*e.g.*, guidelines rules); (7) the imposition of a greater sentence on remand, following a successful appeal, than was originally imposed; and, supplementally, (8) the imposition of departure sentences.

## A. *Former Jeopardy/Double Jeopardy*

We begin with the potentially dispositive issue of whether defendant's reprosecution was barred by former jeopardy under Article I, section 12, of the Oregon Constitution, or by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.[6]

---

[6] Article I, section 12, provides, in part, "No person shall be put in jeopardy twice for the same offence." The Fifth Amendment provides, in part, "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]"

As noted, in defendant's initial trial, the prosecutor, Mascal, made several inappropriate comments in closing argument that provoked the motion for mistrial that we held in *Worth I* should have been granted. Specifically, we held those comments misstated the presumption of innocence by suggesting that it "evaporate[s] when the evidence is closed," when, in fact, the presumption "extended through jury deliberations." *Worth I*, 231 Or App at 76, 79. Defendant predicated his motion on three comments by Mascal, which we identified in *Worth I*:

(1) "I want to thank you for your time and attention over the past few days in listening to this case, this criminal case against this man, who now does not sit before you presumed innocent. He sits before you—"

(2) "But for a few more minutes, sits before you presumed innocent, until you shut that door and start deciding the facts of this case and how the law applies to the facts of that case."

(3) "When that door shuts, when you sit down and you take your initial vote, the presumption of innocence is over."

*Id.* at 72-73, 76.

In seeking dismissal on former jeopardy and double jeopardy grounds, defendant contended that Mascal had been aware of the impropriety of those comments and that she had intentionally provoked a mistrial, or that she did so recklessly or with gross negligence.

Mascal's testimony at the hearing on the motion to dismiss contradicted those allegations. Mascal testified that, at the time of closing argument, she thought that her comments were not problematic and that she had made similar comments about the presumption of innocence without repercussion in "many, many prior trials."

In denying the motion to dismiss, the trial court credited that testimony:

"I find based on the evidence before me today, Ms. Mascal did not know at the time she made those statements that they were an incorrect statement of the law; that she had no intention to cause a mistrial or reversal upon appeal; that she was not indifferent to a mistrial or reversal on

appeal. In fact, she believed the trial had gone very well, and would not have wanted to subject the complaining witness to a retrial there with a reversal, let alone have to go through the trial again for any reason. And I credit that testimony and that is my finding."

We review the trial court's refusal to dismiss with prejudice for legal error, deferring to its factual findings that are supported by the record. *State v. Garner*, 234 Or App 486, 491, 228 P3d 710, *rev den*, 348 Or 621 (2010).

Under Article I, section 12, prosecutorial misconduct bars retrial of a criminal defendant only when each of three conjunctive requirements is satisfied: "(1) the misconduct is so prejudicial that it cannot be cured by means short of mistrial; (2) the prosecutor knew that the conduct was improper and prejudicial; *and* (3) the prosecutor either intended or was indifferent to the resulting mistrial or reversal." *Garner*, 234 Or App at 491 (emphasis added).

The corresponding federal constitutional inquiry also turns on the offending prosecutor's subjective intent. Where a mistrial or reversal has been granted due to prosecutorial misconduct at the behest of the defendant, "the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 US 667, 679, 102 S Ct 2083, 72 L Ed 2d 416 (1982); *accord State v. Mays*, 269 Or App 599, 617, 346 P3d 535 (2015) ("In sum, * * * in determining whether the state and federal constitutional [former and] double jeopardy provisions preclude a retrial, the dispositive issue is whether the prosecutor had the requisite *scienter*." (Emphasis in original.)).

Here, defendant contends that those standards were satisfied, inviting us to "infer that the prosecutor knew what anyone in her position should know" about the contours of the presumption of innocence. In so contending, defendant does not challenge the trial court's factual findings as to the prosecutor's subjective intent as unsubstantiated.

That argument is unavailing. Our standard of review requires deference to the trial court's factual findings

that are supported by the record. *See Mays*, 269 Or App at 617-18 (explaining that, where a trial court finds that a prosecutor did not intend to cause a mistrial and was not indifferent to that result, "the dispositive issue * * * is whether there is evidence to support that finding"—and that such findings are "binding on review as long as there is evidence in the record to support them" (quotation marks and citations omitted)).

Given our standard of review, the trial court's finding that Mascal was unaware of the impropriety of her comments at the time that she made them is conclusive as to the second conjunctive condition of the state constitutional analysis—*viz.*, that "the prosecutor knew that the conduct was improper and prejudicial." Similarly, the trial court's finding that Mascal "had no intention [or reason] to cause a mistrial or reversal upon appeal" and "was not indifferent" to that result is independently dispositive, both as to the third condition of the state law analysis, which requires a showing that "the prosecutor either intended or was indifferent to the resulting mistrial or reversal," *Garner*, 234 Or App at 491, as well as under the federal double jeopardy clause, under which defendant would be entitled to dismissal only if Mascal had "intended to provoke [him] into moving for a mistrial." Accordingly, the trial court did not err in denying defendant's motion to dismiss with prejudice.

B. *The Sufficiency of the Evidence of First-Degree Kidnapping*

For reasons of analytic and dispositional coherence, we address defendant's challenge to the denial of the MJOAs as to the two first-degree kidnapping counts (fourth and fifth assignments of error) before addressing the assignments of error challenging evidentiary rulings. Because our review is fact-intensive, we begin with a detailed description of the predicate events, stating the facts and reasonable attendant inferences in the light most favorable to the state. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989).

Defendant first approached C at a crosswalk near the movie theater, as she had started walking home. Apparently offering C drugs, defendant "had something in his hand and asked if [C] would like some." C declined and kept walking.

She and defendant continued on in the same direction, with defendant several steps ahead, in what C described as "very uncomfortable" proximity to her. Defendant attempted to engage her attention at least three more times. As they walked by an apartment complex, defendant asked C, "Is this where you live?", and C replied "No, I'm going home farther down that way." Defendant then asked if C wanted to go to the convenience store to get something to drink with him; when C declined, defendant handed her a Tri-Met ticket and told her that "next time [she] wouldn't have to walk home."

After that, defendant accelerated his pace, and C lost sight of him and figured that "that was the last time I would see him."

A short time later, when C reached a construction site farther down the road, defendant jumped out from behind a large sign. He grabbed C by her shoulders and pushed her towards a building about 15 feet away from the spot on the sidewalk where he had first accosted her. Defendant pinned C against the side of the building. He put one hand on her neck and, holding an open pocket knife in the other, pointed the blade at her neck. Still holding the blade to C's neck, defendant told her to "to pretend that [she] loved him and to tell him [she] loved him."

C refused to comply and, attempting to escape, pushed defendant. Defendant responded to that attempt by pulling C down to the ground. He then punched her in the face, kneed and kicked her in the head, and put his hand around her throat, choking her.

While C was on the ground, defendant held the knife to her stomach and threatened to hurt her with it if she screamed. Still wielding the knife, defendant grabbed C by her hair and dragged her over to a porta-potty about eight feet away. C, who was disoriented and in a great deal of pain from the beating, thought that she was going to die. Defendant, who still had C by her hair, made her open the door, forced her inside the porta-potty, and shut the door. After proceeding to sexually assault her inside the porta-potty, defendant tied C's hands behind her back with her shirt. Before leaving, he ordered her to stay inside the porta-potty for 10 minutes. C ignored that order, and later

estimated that she was in the porta-potty for a total of three minutes.

Based on that conduct, defendant was charged with, *inter alia*, two counts of first-degree kidnapping. In seeking MJOAs on those counts, defendant argued that there was insufficient proof of the requisite intent "to move a person or confine them in a way that is not incidental to [his] commission of other assaults." Contending that the evidence showed only that "somebody moved [C] perhaps 18 feet for the purpose of putting her into this portable bathroom and assaulting her inside it," defendant argued that that movement and confinement established intent to commit other sexual and physical assaults but not to kidnap.

The state remonstrated:

> "It couldn't be more clear that this defendant intended to substantially interfere with her personal liberty by obstructing her way of travel, by moving her off the sidewalk, concealed up against a construction site and then further concealing her into the porta-potty."

The trial court agreed with the state and denied the MJOAs, reasoning that a reasonable juror could find, based on the evidence, that "defendant intended to substantially interfere with [C's] personal liberty, not merely incidentally" to the perpetration of other charged crimes.

The parties substantially reprise those arguments on appeal. To establish that defendant committed first-degree kidnapping, based on the indictment, the state had to prove that defendant (1) took the victim from one place to another,[7] (2) with the intent to substantially interfere with her personal liberty, (3) without consent or legal authority, and (4) with the purpose of physically injuring or terrorizing her. ORS 163.225; ORS 163.235. Because defendant challenges only the sufficiency of the evidence of intent, our

---

[7] Because our review of the denial of the MJOAs is limited to the charged theory of the crime, we do not consider the "confinement" variant of kidnapping, *see* ORS 163.225(1)(b). *State v. Wolleat*, 338 Or 469, 473 n 3, 111 P3d 1131 (2005) (narrowing alternative elements of the offense based on the indictment). However, even where the state asserts an asportation theory, evidence of confinement is nonetheless "probative of defendant's state of mind." *State v. Mejia*, 348 Or 1, 12, 227 P3d 1139 (2010).

review narrows to whether a rational jury could find that he intended to interfere substantially with C's personal liberty, including her "freedom of movement," *State v. Wolleat*, 338 Or 469, 474, 111 P3d 1131 (2005), such that "the abduction [was] not merely incidental to other related, but independent, crimes," *State v. Washington*, 266 Or App 133, 141, 337 P3d 859 (2014), *rev den*, 356 Or 767 (2015).

The requisite intent may be demonstrated by evidence that the defendant moved the victim a substantial distance or confined the victim for a substantial period of time. *State v. Mejia*, 348 Or 1, 10-12, 227 P3d 1139 (2010). Even if the movement itself was not necessarily "substantial," however, "other evidence" may evince the requisite intent. *Id.* For instance, proof that a defendant physically restrained the victim, thwarted escape attempts, sought to minimize the risk of discovery, or moved the victim to a place that would better facilitate the defendant's control over the victim, is probative of intent to substantially interfere with a victim's freedom of movement. *See id.* at 12; *State v. Zweigart*, 344 Or 619, 636, 188 P3d 242 (2008); *Washington*, 266 Or App at 141.

*Mejia* is exemplary. There, the defendant had lurked outside the victim's front door and, when she got home, forced her inside and repeatedly assaulted her. The Supreme Court explained why the defendant's actions during the course of those events evinced the requisite intent:

> "Defendant moved the victim from her front doorway into her bedroom, took away her cell phone, stifled her screams, physically restrained her, pinned her down and choked her when she attempted to escape, all with the plausible intent to interfere with her liberty. In fact, he *did* interfere with the victim's liberty: He kept the victim confined for about an hour and a half. Such evidence would be sufficient to allow a reasonable trier of fact to find that, apart from his various assaultive and menacing acts, defendant intended to interfere substantially with the victim's personal liberty."

348 Or at 12 (emphasis in original).

Similarly, in *Washington*, the defendant, who was selling magazine subscriptions door-to-door, forced his way into the victim's home, locking the door behind him. The following occurred:

"The victim screamed. Defendant punched her in the face and stomach. He then dragged the victim away from the front door, which was surrounded by windows and in close proximity to neighboring units. Defendant dragged the victim up the stairs inside the apartment, continuing to beat her. Defendant tried to force the victim into a bathroom near the top of the stairs. Fearing that defendant would kill her once inside the bathroom, the victim resisted, and defendant ultimately shoved her to the ground outside the bathroom. Defendant began to rape the victim there. When the victim would not stop screaming, defendant shoved a plastic glove into her mouth. Defendant continued assaulting and raping the victim for some time. He eventually left, after threatening to kill the victim if she called the police."

266 Or App at 135-36. On appeal, we concluded that the kidnapping was not "merely incidental" to the rape, because the "defendant's movement of the victim went beyond what was needed to accomplish the independent crime of rape" and "was preliminary to the subsequent rape and decidedly indicated [the] defendant's intent to *keep* the victim under control and isolated." *Id.* at 141, 145 (emphasis in original).

The circumstances of this case are materially—indeed, dispositively—similar to those of both *Mejia* and *Washington* in several significant respects. Here, as in *Mejia*, defendant lay in wait for his victim, ambushing her at the construction site. Here, as in both *Mejia* and *Washington*, defendant moved the victim from a place where she could have more easily escaped or summoned help to a more secluded location. Specifically, defendant forced the victim off the sidewalk (where they might have been seen by passersby) to the side of the building, and, ultimately, he dragged her to an even more secluded location—the porta-potty—where he sexually assaulted her. Here, as in both *Mejia* and *Washington*, when the victim resisted and attempted to escape, defendant escalated his attack and resorted to violent physical force to defeat those efforts. Defendant's command not to leave the porta-potty was a final attempt to control the victim and avoid discovery.

The state's proof of those circumstances was legally sufficient to establish the requisite intent. That is, from

those circumstances, a rational jury could reasonably infer that defendant specifically intended to substantially deprive the victim of her personal liberty, and that the abduction and assertion of control of the victim was not merely incidental to the commission of the various assaults and sexual offenses.[8] The trial court did not err in denying defendant's MJOAs as to Counts 1 and 2.

C.  *The Admission of Defendant's Inculpatory Statement*

In his second assignment of error, defendant challenges the admission of evidence that, after the original sentencing hearing ended, he stood up and said loudly, "I should have just killed the bitch." A courtroom deputy heard defendant make the statement.[9]

Before the second trial, defendant moved *in limine* to exclude that statement, arguing that it was unfairly prejudicial under OEC 403 and that its admission would violate due process. The trial court disagreed, and, denying the motion, explained:

"Looking first at the probative value—the probative value of the statement is quite high concerning an admission that [defendant] was present and did do something * * * to [C] and impeaches his own prior statements that he was not there at the scene, and that's extremely significant in the context of this case and what the State has to prove.

---

[8] Those circumstances stand in sharp contrast to *Wolleat*, which defendant refers to parenthetically. In *Wolleat*, the defendant and the victim lived together; the defendant grabbed the sleeping victim by her hair, pulled her out of bed, and dragged her approximately 15-20 feet into another room, where he repeatedly struck her. 338 Or at 471. The defendant, charged with first-degree kidnapping and fourth-degree assault, unsuccessfully sought an MJOA on the kidnapping charge on the ground that no reasonable juror could find the requisite intent under those circumstances. *Id.* at 471-72. On appeal, the Supreme Court held that the purported "kidnapping" of the victim was incidental to the commission of the assault, because there was no evidence that the defendant possessed a separate, specific intent to kidnap the victim—*viz.*, to substantially interfere with her or his personal liberty. *Id.* at 478-79; *accord Zweigart*, 344 Or 619 (having conspired to murder his wife, the defendant and another man faked a home-invasion/robbery, moving the victim from her bedroom into the kitchen, where she was executed; the Supreme Court ultimately held that there was legally insufficient evidence of intent to kidnap).

[9] According to the deputy, defendant's full statement was "I should have just killed the bitch. I would have got less time." The trial court redacted the second sentence; consequently, the following analysis pertains only to the first.

"As against that there is prejudice, but I don't see that it is somehow unfair prejudice. Things that are the most probative tend to be the most prejudicial to the person against whose interests they lie. So under the ordinary balancing test I would not exclude the testimony of Deputy Harris, and under the heightened due process standards, I don't think it would violate Mr. Worth's Due Process or other Constitutional rights to admit the statement."

The state presented the deputy's challenged testimony at trial.

On appeal, defendant asserts that the trial court abused its discretion in admitting the statement. *See generally State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den*, 506 US 858 (1992) (a trial court's ruling under OEC 403 is reviewed for an abuse of discretion). Defendant contends that the statement was of "little probative value," because it was just an "emotional outburst," and that it was "highly prejudicial," because it was offered "out of context" as a "blanket admission of guilt" and defendant was "unable to put the statement in context and ameliorate its harm without suffering undue prejudice by revealing that an earlier jury had found him guilty."[10]

Defendant's argument misses the mark. The referent for OEC 403 balancing is not "prejudice" generally but, instead, "unfair prejudice":

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *unfair prejudice*, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

OEC 403 (emphasis added); *see State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000) ("Generally, evidence is *unfairly* prejudicial under OEC 403 if it appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." (Emphasis in original.)).

---

[10] Defendant separately asserts that, had the statement been offered as "evidence of other crimes, wrongs or acts" under OEC 404(4), its admission would violate federal due process. However, he concedes that his due process argument *vis-à-vis* OEC 404(4) is unavailing because the statement was offered as an admission (not as "other acts" evidence). That concession is well taken.

Here, the evidence, while patently prejudicial to the defense, was not "unfairly" so. That is so because, as the trial court so cogently explained, "Things that are the most probative tend to be the most prejudicial to the person against whose interests they lie." In particular, defendant's inculpatory statement flatly contradicted his defense that someone else had assaulted C and that he had been misidentified. The trial court could properly determine, within the range of reasonable discretion, that any collateral "unfair prejudice" to defendant, *e.g.*, adverse juror reaction from defendant's use of offensive language, paled in comparison to that manifest probative value. There was no error.

D.  *The Admissibility of the DNA Evidence*

Finally, with respect to asserted trial-related error, defendant challenges the admission of DNA evidence based on the "PCR-STR" technique, showing that (1) the semen obtained from the sexual assault examination of C matched defendant's DNA and (2) blood on the pocket knife in defendant's possession when he was arrested matched C's DNA. Specifically, defendant argues on appeal that the state was required, but failed, to lay an adequate foundation for the "PCR-STR" technique, and that it presented no evidence as to (1) its potential rate of error, (2) the existence of specialized literature, (3) the extent to which it relies on the subjective interpretation of the expert, (4) its "falsifiability," and (5) whether it has been subject to peer review and publication. Because, as explained below, we conclude that defendant's appellate challenge was unpreserved, we recount in detail what transpired before the trial court.

During the testimony of Michael Koch, the DNA analyst who tested the semen and blood evidence, defense counsel objected: "Objection, foundation, *Daubert*, *O'Key*, *Brown*, Your Honor, *O'Key*." After the jury was excused, the following colloquy occurred:

"THE COURT:   Could you be more specific about your objection?

"MR. REES:   Your Honor, I wasn't trying to make a speaking objection in front of the jury.

"THE COURT: That's why I asked them to step out before you—before I asked you the question. I mean the PCR methodology of DNA analysis was approved by the Oregon Supreme Court in *State v. Lyons*[, 324 Or 256, 280, 924 P2d 802 (1996)]. The RFLP analysis approved by the Oregon Court of Appeals in *State v. Futch*, [123 Or App 176, 860 P2d 264 (1993), *aff'd*, 324 Or 297, 924 P2d 832 (1996)], which was affirmed * * * by the Oregon Supreme Court. So what's your challenge today?

"MR. REES: Well, Your Honor, the State has not submitted evidence as to what sort of test this scientist used to determine that there was a partial male profile on this one exhibit. *So I suppose if he elaborates on what he did and what technique he used, it might be the State has ability to lay the foundation, but they haven't done it yet.*

"THE COURT: Okay. I think you are right. We don't know whether the method used is one that has been approved by our Appellate courts. I'll sustain the objection."

(Emphasis added.)

The trbial court decided to hold an OEC 104 hearing on that matter. In that hearing, the state elicited testimony from Koch that he had used the "PCR-STR"—that is, "polymerase chain reaction" and "short tandem repeats"—"methodologies and technologies" that are "widely accepted" in the field, used by "every State Crime Lab," and subject to rigorous testing.

On cross-examination during the OEC 104 hearing, defense counsel questioned Koch about how he drew his conclusion that a "partial male [DNA] profile" recovered from C's thigh and a "full male profile" recovered from C's chest matched defendant's DNA from an oral swab. Counsel elicited testimony that the "statistical weight" of the full profile match was one in "ten billion"—in the sense that Koch would not expect to see another matching profile "even if you sampled ten billion people"—and that that of the partial profile match was about one in 13,000, meaning that if he tested samples from 13,000 additional people, he "might expect to see the partial profile exhibited and characterized off of that exhibit maybe once."

At that point, the prosecutor objected on the ground that the questioning had moved beyond the scope of the foundational objection. The following colloquy ensued:

"THE COURT:   I think we're past the 104 issues at this point, Mr. Rees. *Is there something else you wanted to get to on the foundational questions?*

"MR. REES:   Okay. Well, I was just exploring the methodology for comparing the partial profile and concluding it was a partial male profile and establishing its relevance.

"THE COURT:   Maybe I misunderstood. I thought he said it's the same methodology that yields the result. The result may be partial or complete; maybe I misunderstood.

"[KOCH]:   No, that would be a negative.

"THE COURT:   *Anything else then?*

"MR. REES:   *No.*

"THE COURT:   *Any further argument on the admissibility concerning the scientific reliability or validity of the methodology used by Mr. Koch?*

"MS. MASCAL:   No, Your Honor. I will ask him those questions to establish foundation when the jury returns.

"THE COURT:   *Anything else, Mr. Rees?*

"MR. REES:   *No, Your Honor.*

"THE COURT:   The foundational objection on the scientific validity issue is overruled. The validity of the scientific methodology, that is to say."

(Emphases added.)

Now, on appeal, defendant challenges the admission of the DNA evidence on the ground that the state was required, but failed, to lay a foundation for admission of that evidence, because "[t]he scientific validity of STR-DNA has not yet been addressed by the appellate courts of Oregon" under the combined *Brown/O'Key* factors.[11] In particular,

---

[11] *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984), sets out seven factors "to be considered as guidelines" in evaluating the probative value and reliability of proffered scientific evidence under OEC 401, OEC 403, and OEC 702:

"(1) The technique's general acceptance in the field; (2) The expert's qualifications and stature; (3) The use which has been made of the technique;

defendant now argues—for the first time—that "the state did not present evidence as to how the STR technique differs from (or is the same as) other DNA testing that has been approved by the appellate courts." Defendant further contends—again, for the first time—that the state failed to present evidence about five of the 11 combined *Brown/O'Key* factors, including (1) the potential rate of error for the STR technique, (2) the existence of specialized literature, (3) the extent to which the technique relies on the subjective interpretation of the expert, (4) the "falsifiability" of the technique, and (5) whether the technique has been subject to peer review and publication.

The state remonstrates that defendant's appellate challenge to the foundational admissibility of the DNA evidence is utterly unpreserved and, hence, unreviewable. We agree. *See, e.g., State v. Perry*, 347 Or 110, 123 n 14, 218 P3d 95 (2009) ("[W]here a trial court has ruled that certain evidence is admissible as 'scientific evidence,' a party ordinarily may not predicate a claim of reversible error on the court's failure to address one or more criteria that the party did not argue."); *State v. Baucum*, 268 Or App 649, 664 n 17, 343 P3d 235 (2015) (declining to consider arguments pertaining to specific *Brown/O'Key* factors that were not raised before the trial court).

As recounted above, the sole basis on which defendant sought, and for which the trial court undertook, the OEC 104 hearing was to ascertain "what sort of test" Koch had used. The state then established that Koch had used the "PCR-STR" methodology to identify the semen and blood evidence. Thereafter, and notwithstanding the trial court's reference to the Supreme Court's decision in *Lyons* and our

---

(4) The potential rate of error; (5) The existence of specialized literature; (6) The novelty of the invention; and (7) The extent to which the technique relies on the subjective interpretation of the expert."

*State v. O'Key*, 321 Or 285, 303-04, 899 P2d 663 (1995), supplemented the *Brown* analysis with four more factors, although the two sets of factors overlap in various ways: (1) "whether the theory or technique in question can be (and has been) tested"; (2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error and the existence of operational standards controlling the technique's operation," and (4) "the degree of acceptance in the relevant scientific community." (Internal quotation marks omitted.)

decision in *Futch*, defense counsel made no effort—either by way of cross-examination of the expert, Koch, or through argument to the trial court in the OEC 104 hearing or later— to contend that the "PCR-STR" technique was so materially different from the PCR technique approved in *Lyons* as to require an independent and distinct foundational showing.[12] In a related sense, trial counsel raised no argument concerning any insufficiency of proof as to any of the five *Brown/O'Key* factors now highlighted in defendant's appellate brief.

In sum, defendant failed to "alert [the] trial court to its [purported] failure" to address those issues. *Peeples v. Lampert*, 345 Or 209, 222, 191 P3d 637 (2008). The matter is unreviewable as unpreserved.

E. *Asserted Error in Imposing Consecutive Dangerous Offender Sentences*

Having rejected the claimed errors relating to defendant's convictions, we turn, finally, to his sentencing-related challenges. Specifically, defendant contends that the trial court erred in failing to apply certain provisions of the Felony Sentencing Guidelines (the guidelines) in determining the length of the *determinate* components of his sentences.

The resolution of that contention is complex and, as will become evident shortly, turns on the arcane inter-action of several features of an evolving sentencing scheme, including the so-called "shift-to-I" rule, "200%" rule, and "400%" rule, and dangerous offender sentences. With apol-ogies to the parties—and patient readers of the bench and bar—extended explication is unavoidable. Specifically, our

---

[12] *Cf. Lyons*, 324 Or at 280 n 31:

"Once a trial court has decided that a type of proffered scientific evidence is scientifically valid and has admitted such evidence for the particular pur-pose to which it is directed, and that decision is affirmed by this court in a published opinion, it will become controlling precedent in later trials. In this case, we hold that PCR-based DNA evidence satisfies the *Brown* standard of admissibility. Accordingly, it is no longer necessary for trial courts to conduct *Brown* inquiries to determine whether such evidence is admissible for foren-sic purposes. As each new technique is developed, however, trial courts will be required to determine whether that new technique is scientifically valid and, if so, whether the particular evidence should be admitted or excluded under OEC 401, OEC 702, or OEC 403 in the light of the specific facts of the particular case."

(Emphasis omitted.)

consideration addresses, in turn: (1) the guidelines provisions that defendant invokes; (2) the content and operation of the dangerous offender statutes antedating the Supreme Court's pivotal decision in *State v. Davis*, 315 Or 484, 847 P2d 834 (1993) (*Davis II*); (3) the decision in *Davis*; and (4) 1993 amendments to pertinent guidelines provisions, in the wake of *Davis*. Our analysis that follows turns on the distinction between the *determinate* and *indeterminate* components of dangerous offender sentences—a distinction that we will amplify below[13]—and concludes that the trial court erred in failing to apply the "400%" rule, OAR 213-008-0007(3), to limit the former. That error requires a remand for resentencing.

1. *Sentencing proceedings in the trial court*

We begin with an overview of the sentencing proceedings. At defendant's second trial, the state sought to have him sentenced as a dangerous offender, with the maximum possible sentence, on all counts. Based on the jury's findings that defendant met the dangerous offender criteria and of other enhancement facts,[14] the state's sentencing

---

[13] In a nutshell, defendant was sentenced under the dangerous offender sentencing scheme. For each qualifying offense, a dangerous offender receives an indeterminate sentence of up to 30 years. *See* ORS 161.725; ORS 161.735 (setting out required findings and procedure for imposition of a dangerous offender sentence). In addition, the offender receives a determinate sentence, which is the portion of the indeterminate term that must be served prior to becoming eligible for release. *See State v. Coburn*, 146 Or App 653, 655, 934 P2d 579 (1997) (a determinate sentence is the part of an indeterminate term "that the offender *has* to serve before becoming eligible for release to post-prison supervision" (emphasis in original)). After serving the entire determinate term, a dangerous offender, though eligible for release, may remain incarcerated for the duration of the indeterminate sentence. *See* ORS 144.288; ORS 144.232.

[14] Here, the jury found that (1) defendant was suffering from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another (all counts); (2) defendant had previously engaged in unlawful conduct not related to the instant crimes as a single criminal episode that seriously endangered the life or safety of another (Counts 4, 5, 6, and 8); (3) the commission of first-degree kidnapping constituted a Class A felony because he had an intent to cause injury (Count 1) and to terrorize (Count 2); (4) the commission of first-degree unlawful sexual penetration constituted a Class A felony (Count 7); and (5) the commission of first-degree sexual abuse and second-degree assault constituted felonies that seriously endangered the life or safety of another (Counts 4, 5, 6, and 8).

The jury found the following enhancement facts on all counts: (1) defendant engaged in deliberate cruelty, (2) C was a vulnerable victim; (3) defendant threatened the use of actual violence, (4) defendant had been involved in crimes against multiple unrelated victims and multiple unrelated incidents, and (5) there is a probability that defendant cannot be rehabilitated.

memorandum recommended that defendant receive consecutive, 30-year indeterminate sentences on each count. The state's proposal calculated the determinate portions of each of the proposed sentences by reference to Criminal History Column A in the guidelines grid block, and recommended consecutive departure terms of 240 months on Count 1, 90 months on Count 4, 240 months on Count 7, and 120 months on Count 8.

Defendant requested concurrent Measure 11 sentences on all counts. Further, his sentencing memorandum alternatively argued that, if consecutive dangerous offender sentences were imposed, the length of the determinate portions of those sentences was circumscribed by the "shift-to-I," "200%," and "400%" rules established by OAR 213-008-0007 and OAR 213-012-0020. Defendant specifically argued that (1) the trial court was required to calculate all presumptive sentences except for the primary (most serious) offense by reference to Criminal History Column I on the grid block (thereby yielding lower presumptive sentences for those counts); (2) each departure sentence could not exceed twice its corresponding presumptive sentence; and (3) the total sentence imposed could not exceed four times the maximum presumptive sentence for the primary offense.

At the sentencing hearing, the trial court noted that the state's memorandum had not addressed the rules that defendant invoked, and requested the state's position as to their applicability. The state's response was categorical: Under the relevant guidelines and statutes, "the Shift-to-I rule, the 200 percent and 400 percent rule do not apply to dangerous offender sentences" under any circumstances. In reply, defense counsel acknowledged that the rules do not apply to *indeterminate* dangerous offender sentences, but continued to maintain that they do apply to the *determinate* portion of any dangerous offender sentence. The court did not explicitly address that dispute. However, in imposing sentences, the court ultimately, by necessary implication, adopted the state's position.

Because the trial court merged Count 2 with Count 1, and merged Counts 5 and 6 with Count 4, it entered

convictions on four counts: first-degree kidnapping (Count 1), first-degree sexual abuse (Count 4), first-degree unlawful penetration (Count 7), and second-degree assault (Count 8). The court sentenced defendant as a dangerous offender, imposing both an indeterminate, consecutive 30-year sentence and a determinate sentence on each of the four counts. Designating Count 1 as the primary offense, the court imposed consecutive upwards departure determinate sentences as follows:

> Count 1: 240 months (departure from 130-month presumptive maximum sentence; grid block 10-A)

> Count 4: 90 months (departure from 45-month presumptive maximum sentence; grid block 8-A)

> Count 7: 144 months (departure from 72-month presumptive maximum sentence; grid block 9-A)

> Count 8: 120 months (departure from 72-month presumptive maximum sentence; grid block 9-A)

Consequently, defendant's total *determinate* term of incarceration was 594 months, and his total *indeterminate* sentence was 120 years.[15]

On appeal, the parties substantially reprise their arguments. Defendant asserts that, under a proper application of OAR 213-012-0020(2) and OAR 213-008-0007(3), the total of his consecutive determinate dangerous offender sentences could not lawfully exceed 400 months. The state, citing OAR 213-012-0020(5), argues that, in all events, neither of those provisions applies to any aspect of a dangerous offender sentence.

---

[15] The practical import of that sentence is that, if defendant were still alive after serving 594 months (49.5 years) in prison, he would become eligible for post-prison supervision, but would remain incarcerated for the remainder of the 120-year indeterminate term unless and until the Board of Parole and Post-Prison Supervision determined that he was fit for release. *See* ORS 144.226; ORS 144.228; ORS 144.232.

The mandatory minimum sentences under Measure 11 for defendant's offenses are as follows: 90 months for Count 1, 75 months for Count 4, 100 months for Count 7, and 70 months for Count 8. ORS 137.700. Consecutively imposed Measure 11 minimum sentences are not subject to the guidelines, *State v. Langdon*, 330 Or 72, 74, 999 P2d 1127 (2000), but when a guidelines-based sentence exceeds the Measure 11 minimum, the guidelines do apply, *State v. Skelton*, 153 Or App 580, 591, 957 P2d 585, *rev den*, 327 Or 448 (1998).

## 2. *The 1989 felony sentencing guidelines*

We proceed to the guidelines provisions that defendant invokes, placing them in historical and functional context. In 1989, the legislature abolished the old indeterminate sentencing and parole matrix system and replaced it with the guidelines:

> "[U]nder the sentencing guidelines system that came into force in 1989, trial courts are charged with imposing a determinate sentence for most felony convictions. That sentence is based on a presumptive term determined pursuant to a set of legislatively approved guidelines, from which a sentencing court has limited discretion to deviate. The inmate then serves the sentence that the trial court imposes, without eligibility for release on parole. The sentencing guidelines system thus eliminated any kind of release on parole for persons subject to its provisions."

*Engweiler v. Board of Parole*, 343 Or 536, 540-41, 175 P3d 408 (2007) (internal citations omitted).[16] Thus, the indeterminate sentencing system was set aside in favor of one that generally required determinate sentences.

Under the guidelines, a "presumptive sentence" was—and still is—set by reference to the guidelines grid block, and must be imposed "unless the judge finds substantial and compelling reasons to impose a departure." OAR 213-008-0001. An offense's presumptive placement on the grid block depends upon its seriousness (the vertical axis), and on the offender's criminal history (the horizontal axis), and "[t]he intersection of the two axes" establishes the presumptive sentence range for each offense. *State v. Langdon*, 330 Or 72, 74, 999 P2d 1127 (2000); *see State v. Speedis*, 350 Or 424, 427, 256 P3d 1061 (2011) (discussing presumptive sentencing procedure); *see also* OAR 213-004-0002; OAR 213-004-0006; OAR 213-004-0007 (describing crime seriousness and criminal history scales).

In addition, the guidelines permit a sentencing court to depart upward or downward from the presumptive

---

[16] Under the matrix system, "for any particular offender, the trial court imposed an indeterminate sentence of a specified maximum duration, and the board determined the actual duration of imprisonment by its parole release decision." *Engweiler*, 343 Or at 540.

sentence under certain circumstances, "based upon aggravating or mitigating factors." *Langdon,* 330 Or at 74; *see* OAR 213-008-0002 (listing departure factors). Thus, under the guidelines, anything over the maximum presumptive sentence is, necessarily, a "departure." OAR 213-003-0001(5) ("'Departure' means a sentence, except an optional probationary sentence, which is inconsistent with the presumptive sentence for an offender."). Departures have their own procedural and durational requirements. *See, e.g.,* OAR 213-008-0001 (requiring imposition of presumptive sentence barring "substantial and compelling reasons" for a departure, stated on the record); OAR 213-008-0003 (setting out rules on the duration of departures).

The 1989 guidelines also established several limitations on consecutive sentences—the so-called "shift-to-I," "200%," and "400%" rules—which have since been amended to create certain exceptions, but otherwise remain intact.

*Former* OAR 253-12-020 (1989), *renumbered as* OAR 213-012-0020 (Mar 8, 1996), established a two-part methodology for calculating consecutive *presumptive (i.e.,* nondeparture) sentences:

"(2)**(a)** Subject to the provisions of subsection (b) of this section, the presumptive incarceration term of the consecutive sentences is the sum of:

"(A) The presumptive incarceration term for the primary offense * * *; and

"(B) Up to the maximum incarceration term indicated in the Criminal History I Column for each additional offense imposed consecutively.

"**(b)** The total incarceration term of the consecutive sentences, including the incarceration term for the primary offense, shall not exceed twice the maximum presumptive incarceration term except by departure as provided by [*former*] OAR 253-08-007 [(1989)]."

(Boldface added.)

First, subsection (2)(a) establishes the "shift-to-I" rule. After determining the presumptive term of the "primary offense"—*i.e.,* the actual nondeparture sentence to be imposed for the offense with "the highest crime seriousness

ranking," OAR 213-003-0001(17)—a trial court then imposes a presumptive incarceration term for each additional offense by reference to Criminal History Column I on the grid block; "in other words, sentences for crimes other than the primary offense are calculated as though the defendant had no prior criminal history." *State v. Longenecker*, 175 Or App 33, 40, 27 P3d 509 (2001). The offender's total consecutive incarceration term (again, in the absence of any departure sentences) cannot exceed the sum of the sentences for the primary offense and each additional offense so calculated. Thus, the "shift-to-I" rule imposes an absolute outer limit for the total incarceration term for consecutive, nondeparture sentences. However, depending on the circumstances, that outer limit may be further circumscribed by reference to the additional qualification prescribed in subsection (2)(b), the "200%" rule.

The "200%" rule of subsection (2)(b) is incorporated by reference into subsection (2)(a). Under it, the total incarceration term for all consecutive sentences cannot exceed "twice the maximum presumptive incarceration term except by departure." *See State v. Miller*, 317 Or 297, 302, 855 P2d 1093 (1993); *Longenecker*, 175 Or App at 40. Thus, a sentence that comports with the "shift-to-I" rule, but violates the "200%" rule, must be adjusted to comply with the latter.

The other pertinent component of the consecutive sentencing methodology established by the 1989 guidelines is *former* OAR 253-08-007 (1989), *renumbered as* OAR 213-008-0007 (Mar 8, 1996), which pertains to consecutive *departure* (as opposed to presumptive) sentences. The 1989 version of that rule provided, in relevant part:

> "(3)  When a departure sentence is imposed for any individual offense sentenced consecutively, the incarceration term of that departure sentence shall not exceed twice the maximum presumptive incarceration term that may be imposed for that offense as provided in [*former*] OAR 253-12-020(2)(a) [(1989)]."

Thus, under OAR 213-008-0007(3), the maximum incarceration term for each consecutive departure sentence is double the corresponding maximum presumptive term—that is, the *adjusted* presumptive term calculated

in accordance with OAR 213-012-0020(2)(a), aka the "shift-to-I" rule, subsection (2)(a), which, by virtue of its "subject to" cross-reference to subsection (2)(b), requires presumptive sentences to be imposed in accordance with *both* the "shift-to-I" and "200%" rules. Consequently, OAR 213-008-0007(3), by incorporating subsection (2)(a), necessarily encompasses *both* limitations on the presumptive sentence baseline from which the maximum total incarceration term for consecutive departure sentences is derived. *Davis II*, 315 Or at 493-94. To reiterate: OAR 213-008-0007(3) limits each departure sentence to no more than twice the corresponding maximum presumptive (nondeparture, grid block) sentence, calculated according to the complete OAR 213-012-0020(2) methodology. Thus, (1) each individual sentence cannot exceed twice its presumptive maximum and, for all but the primary offense, the presumptive maximum must be determined under Criminal History Column I on the grid block; and (2) the total incarceration term cannot exceed four times the maximum presumptive term for the primary offense.[17]

3. *Dangerous offender sentencing before Davis: the 1989 amendments*

The dangerous offender sentencing scheme predated the 1989 adoption of the guidelines system. *See* Or Laws 1971, ch 743, §§ 85, 86 (codified as ORS 161.725 and ORS 161.735). As originally enacted in 1971, those statutes were designed to provide an enhanced maximum punishment, and extended supervision, of offenders who possess a "severe personality disorder indicating a propensity toward criminal activity." *See State v. Sanders*, 35 Or App 503, 509,

---

[17] At the risk of potential (additional) confusion, we reiterate our observation in *State v. Determann*, 122 Or App 480, 483-84, 858 P2d 171, *rev den*, 318 Or 26 (1993), that referring to OAR 213-008-0007(3) as "the 400% rule is a bit of a misnomer" insofar as it implies that OAR 213-008-0007(3), through its integration of the "200%" rule, simply limits the cumulative length of consecutive departure sentences to no more than four times the presumptive maximum on the primary offense. That characterization fails to account for the fact that OAR 213-008-0007(3) also incorporates the "shift-to-I" rule, and its essential requirement is that every individual consecutive departure sentence cannot be more than double its corresponding maximum *adjusted* presumptive sentence. *See Davis II*, 315 Or at 494 n 16 (illustrating how, "[a]lthough 400 percent is the absolute maximum in any case, in some cases the maximum incarceration term may be *less* than that amount" under the shift-to-I rule (emphasis in original)).

582 P2d 22 (1978), *rev den*, 285 Or 195 (1979) ("ORS 161.725 provides for a magnified sentence of incarceration for the dangerous offender as a means of preventing that individual from inflicting future harm."). Specifically, such offenders were subject to *indeterminate* sentences of up to 30 years on qualifying crimes—10 years longer than the 20-year maximum indeterminate sentence of imprisonment prescribed for a Class A felony. *See* ORS 161.605.

"Determinate" sentences, as that term is now understood, did not exist under the original dangerous offender scheme. Rather, consistently with the now-defunct parole matrix system, the Parole Board was, by default, charged with setting a dangerous offender's parole eligibility date.[18]

The 1989 guidelines were silent concerning dangerous offender sentences. However, the 1989 legislature "integrate[d] the dangerous offender statutes into the guidelines system" by enacting ORS 161.737. *Sentencing Guidelines Implementation Manual*, Oregon Criminal Justice Council Commentary, 142-43 (1989); Or Laws 1989, ch 790, § 77. ORS 161.737, as originally enacted, provided:

"(1) A sentence imposed under ORS 161.725 and 161.735 for felonies committed on or after November 1, 1989, *shall constitute a departure* from the sentencing guidelines created by rules of the State Sentencing Guidelines Board. The findings made to classify the defendant as a dangerous offender under ORS 161.725 and 161.735 shall constitute substantial and compelling reasons to depart from the presumptive sentence as provided by rules of the State Sentencing Guidelines Board.

"(2) When the sentence is imposed, the sentencing judge shall indicate on the record the reasons for the departure *and the presumptive sentence that would have been*

---

[18] Courts were not required to impose the minimum term of incarceration that a dangerous offender had to serve before becoming eligible for parole, although they *could* impose a minimum prison term of up to half the length of the indeterminate sentence under ORS 144.110. *Allred v. Board of Parole*, 124 Or App 278, 862 P2d 546 (1993). If not judicially imposed, the parole eligibility date was set by the Parole Board. ORS 144.228 (1971); *Scott v. Baldwin*, 225 F3d 1020, 1021 n 2 (9th Cir 2000) ("All inmates in Oregon must serve a mandatory minimum sentence. The trial court can impose such a minimum * * *. Otherwise, Oregon's parole matrix system imposes a minimum for every crime.").

*imposed if the court had not imposed the sentence under ORS 161.725 and 161.735 as a departure."*

(Emphases added.)

Thus, the legislature modified dangerous offender sentencing in accordance with the guidelines in two pertinent respects. First, under ORS 161.737(1), a dangerous offender sentence was, in fact, a "departure" sentence under the guidelines. *See Davis II*, 315 Or at 490 ("[A] dangerous offender sentence is a departure sentence *within* the guidelines, rather than a sentence that falls *outside* the guidelines." (Emphasis in original.)).

Second—and, of critical importance to our consideration—ORS 161.737(2) and related, contemporaneously enacted statutes modified how a dangerous offender's release eligibility date was to be determined. Specifically, the combination of ORS 144.226, as amended in 1989, and ORS 161.737(2) had the practical effect of rendering the court's "indicat[ion] * * * [of] the presumptive sentence that would have been imposed" under the guidelines the *determinate* prison term. *See* ORS 144.226 (1987), *amended by* Or Laws 1989, ch 790, § 78 (requiring the Board of Parole and Post-Prison Supervision to begin biannual reviews of a dangerous offender's correctional status on "the last day of the presumptive sentence established under [ORS 161.737]"); *see also Sentencing Guidelines Implementation Manual* at 142-47 (1989) (comprehensive overview of 1989 integration of dangerous offender sentencing with the guidelines).

4.  *State v. Davis*

Three years after those changes were implemented, in 1992, we addressed the relationship between the guidelines and dangerous offender sentences, holding that an *indeterminate* dangerous offender sentence was subject to the consecutive sentencing limitations established by OAR 213-008-0007(3).[19] *State v. Davis*, 113 Or App 118, 120, 830 P2d 620 (1992) (*Davis I*). The Supreme Court subsequently accepted review and affirmed. *Davis II*, 315 Or at 486.

---

[19] *Davis* was decided before those rules were renumbered. We employ their current designations.

The defendant in *Davis* had received three consecutive departure sentences, including a 360-month indeterminate dangerous offender sentence, which together amounted to a 660-month prison term.[20] He argued on appeal that "the imposition of [indeterminate] dangerous offender sentences [did] not override the limitations on consecutive sentences provided in the sentencing guidelines," and that, under OAR 213-012-0020(2) and OAR 213-008-0007(3), the maximum total consecutive sentence that could be imposed, even by departure, was quadruple the 90-month presumptive maximum sentence on the primary offense. *Davis I*, 113 Or App at 120-21.

The state countered that "the consecutive sentence rules were drafted with the understanding that they would apply to determinate sentences imposed under the guidelines, not to the indeterminate sentence portion of a dangerous offender sentence." *Id.* at 121; *see Davis II*, 315 Or at 491. Thus, the sole issue presented in *Davis* was whether an *indeterminate* dangerous offender sentence was subject to the guidelines—neither we nor the Supreme Court had occasion to consider the application of the guidelines to the determinate component of such a sentence.

We concluded that the indeterminate term of the dangerous offender sentence was subject to the guidelines' limitations, specifically including the "400%" limitation on the total length of consecutive departure sentences. *Davis I*, 113 Or App at 121-22. The Supreme Court affirmed in a 1993 opinion that, in addition to dealing with dangerous offender sentences, provided a general explanation of the guidelines' consecutive sentencing methodology (which, except in circumstances subject to certain later-enacted exceptions, is

---

[20] The defendant in *Davis* was convicted on two counts of first-degree rape, six counts of first-degree sodomy, and one count of first-degree kidnapping. The trial court imposed the following sentences: (1) a 180-month departure sentence on one rape count (Count 1) based on a 90-month presumptive under grid block 10-E; (2) a 120-month departure sentence on one sodomy count (Count 5), based on a 60-month presumptive maximum calculated under grid block 10-I; and (3) a dangerous offender sentence on the remaining seven counts. The trial court specified that the 30-year indeterminate term as to each of the dangerous offender sentences would run concurrently with the others but would be consecutive to the terms for Counts 1 and 5. The court further indicated that it would have imposed 60-month presumptive sentences on those seven counts. *Davis II*, 315 Or at 488-89; *Davis I*, 113 Or App at 120, 120 n 1.

still authoritative today). *See Davis II*, 315 Or at 491-94. As to that methodology's application to sentences imposed under the 1989 dangerous offender statutes, the Supreme Court reasoned that, because an indeterminate dangerous offender sentence was defined as a guidelines "departure" sentence and its determinate component as the "presumptive" sentence, the indeterminate portion of the sentence was subject to generally applicable rules on departures, including those pertaining to consecutive sentences. *Id.* at 494-95; *accord State v. Coburn*, 146 Or App 653, 655, 934 P2d 579 (1997) (observing that the Supreme Court's holding in *Davis II* pertained to the application of the "400%" rule to the indeterminate portion of a dangerous offender sentence).[21]

5. *The 1993 amendments*

In 1993, in the wake of *Davis*, the legislature revamped dangerous offender sentencing with the enactment of House Bill 2478, which contained amendments to the guidelines and to various dangerous offender statutes. *See* Or Laws 1993, ch 334. Specifically, OAR 213-012-0020, OAR 213-008-0007(3), and ORS 161.737(2) were all amended pursuant to HB 2478 to include new text at the core of our consideration.[22]

First, amended OAR 213-012-0020 now provides, in relevant part:

"(2)(a)   Subject to the provisions of subsection (b) of this section, the presumptive incarceration term of the consecutive sentences is the sum of:

"(A)   The presumptive incarceration term or the prison term defined in OAR 213-008-0005(1) imposed pursuant

---

[21] Critically, at the time that the Supreme Court (and we) decided *Davis*, the trial court's "indicate[d]" putative presumptive sentence "serve[d] as the determinate part of the dangerous offender sentence." *Davis II*, 315 Or at 489. Thus, at that time, the determinate and presumptive sentences for dangerous offenders were congruent. As described below, in the wake of the 1993 post-*Davis* amendments, that necessary congruency no longer existed—and, in fact, the determinate component of a dangerous offender sentence can, and commonly does, include a term in excess of the presumptive sentence, *i.e.*, a "determinate departure." *See* 274 Or App at 34, 34-35.

[22] *See* Or Laws 1993, ch 334, §§ 6, 9, 11. We refer to those provisions by their current designations, but note that HB 2478 in fact amended OAR 253-08-007 and OAR 253-12-020, which, as noted above, were later renumbered.

to a dispositional departure for the primary offense, as defined in OAR 213-003-0001(17); and

"(B) Up to the maximum incarceration term indicated in the Criminal History I Column for each additional offense imposed consecutively.

"(b) The total incarceration term of the consecutive sentences, including the incarceration term for the primary offense, shall not exceed twice the maximum presumptive incarceration term or the prison term defined in OAR 213-008-0005(1) imposed pursuant to a dispositional departure of the primary sentence except by departure as provided by OAR 213-008-0007.

"* * * * *

"(5) **Sections (1), (2), and (3) of this rule shall not apply to any sentence imposed on a dangerous offender under ORS 161.725 and 161.737** * * *."[23]

Or Laws 1993, ch 334, § 11 (amendments in boldface).

Second, amended OAR 213-008-0007(3) now provides:

"(3) When a departure sentence is imposed for any individual offense sentenced consecutively, the incarceration term of that departure sentence shall not exceed twice the maximum incarceration term that may be imposed for that offense as provided in OAR 213-012-0020(2)(a). **This limit on the duration of a departure sentence does not apply to any indeterminate sentence imposed on a dangerous offender under ORS 161.725 and 161.737** * * *."

Or Laws 1993, ch 334, § 9 (amendments in boldface).

Thus, those 1993 amendments carved out two exceptions to the guidelines' previously unqualified consecutive sentencing rules: one to the "shift-to-I" and "200%" provisions, pertinent to consecutive *presumptive* sentences, and the other to the "400%" rule, pertinent to consecutive *departure* sentences. The new OAR 213-012-0020(5) states that the "shift-to-I" and "200%" rules do not apply to *"any sentence* imposed on a dangerous offender under ORS 161.725

---

[23] The boldface text was originally enacted as OAR 253-12-020(4), and later renumbered to accommodate subsequent amendments that are immaterial here.

and 161.737." (Emphasis added.) Further, the amendment to OAR 213-008-0007(3) states that its limitations pertaining to consecutive departure sentences do not apply to "any *indeterminate* sentence imposed on a dangerous offender." (Emphasis added.)

We pause to note—for further explication below—an at least ostensible tension between those two exceptions. While the former pertains to "*any* sentence imposed on a dangerous offender" (emphasis added), the latter pertains only to the indeterminate component of a dangerous offender sentence. We will revisit this matter shortly.

Finally, the third salient aspect of HB 2478 is its amendment of ORS 161.737(2), which establishes the requirements for the determinate part of a dangerous offender sentence, as follows:

> "When the sentence is imposed, the sentencing judge shall indicate on the record the reasons for the departure and **shall impose, in addition to the indeterminate sentence imposed under ORS 161.725, a required incarceration term that the offender must serve before release to post-prison supervision. If** the presumptive sentence that would have been imposed if the court had not imposed the sentence under ORS 161.725 and 161.735 as a departure **is a prison sentence, the required incarceration term shall be no less than the presumptive incarceration term and no more than twice the maximum presumptive incarceration term. * * *. However, the indeterminate sentence imposed under this section and ORS 161.725 is not subject to any guideline rule establishing limitations on the duration of departures."**

Or Laws 1993, ch 334, § 6 (amendments in boldface).

Two features of those amendments are significant. First, as with the concurrently enacted amendment to OAR 213-008-0007(3)—and distinct from the sweeping exclusion of OAR 213-012-0020(5)—the preclusion of the application of "any guidelines rule establishing limitations on the duration of departures" pertains only to the "indeterminate" component of a dangerous offender sentence.

Second, while the determinate term was previously tied to the grid block presumptive sentence, *see* 274 Or App at 28-29, sentencing courts are now afforded some discretion with respect to its duration, which must be "no less than the presumptive incarceration term and no more than twice the maximum presumptive incarceration term." Thus, a trial court imposing a determinate dangerous offender sentence is afforded the same (relative) flexibility available in imposing an ordinary departure sentence.

The upshot is that those 1993 amendments to ORS 161.737(2) changed the treatment of determinate dangerous offender sentences within the guidelines. In contrast to the framework in place when *Davis* was decided, under which such sentences were necessarily presumptive,[24] the determinate portion of a dangerous offender sentence can now exceed the presumptive term to the same extent as an ordinary departure sentence if the trial court exercises its enhancement discretion under the amended ORS 161.737(2). *See* OAR 213-008-0003(2) ("A durational departure from a presumptive prison term shall not total more than double the maximum duration of the presumptive prison term."). Thus, consistent with the guidelines' definition of a "departure" as, essentially, any sentence "which is inconsistent with the presumptive sentence," a dangerous offender's determinate sentence can now be a departure sentence.

6. *Analysis*

Against that dense and protracted backdrop, we return to the issue at hand: What is the proper application of OAR 213-008-0007(3) and OAR 213-012-0020(2) and (5) to the determinate portion of a dangerous offender sentence imposed pursuant to ORS 161.737(2)?

Our answer to that question, while perhaps imperfect, derives from our best efforts to resolve the ostensible tension noted above: On one hand, OAR 213-008-0007(3) necessarily contemplates the application of the "400%" rule to the determinate component of a dangerous offender sentence; on the other hand, OAR 213-012-0020(5) expressly precludes the application of the predicates of the "400%"

---

[24] *See* 274 Or App at 31 n 21.

rule (the "shift-to-I" and "200%" rules established by OAR 213-012-0020(2)) to any dangerous offender sentence. As with any matter of statutory construction, our ultimate object is to discern the legislature's intent and, to the extent possible, give optimal effect to that intent. *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).[25] We must, to the extent possible, give effect to both of those provisions. ORS 174.010 ("[W]here there are several provisions or particulars," the court, "if possible," is to adopt "such construction * * * as will give effect to all."); *see also Force v. Dept. of Rev.*, 350 Or 179, 190, 252 P3d 306 (2011) (rejecting construction that would prevent enforcement of a party's state tax obligation in favor of one that would "avoid that anomaly and allow for the enforcement * * * as the legislature intended").

Consistently with those principles, we conclude that, in those circumstances (as here), where a trial court, pursuant to ORS 161.737(2), imposes a determinate dangerous offender sentence in excess of the presumptive sentence—that is, a "determinate departure"—the "400%" rule, including its incorporation of OAR 213-012-0020(2), applies to limit the total *determinate* terms of consecutive sentences. However, as expressly provided in OAR 213-008-0007(3) and ORS 161.737(2), that constraint does not apply to the *indeterminate* component of consecutive dangerous offender sentences. Conversely, where a trial court limits the determinate component of a dangerous offender sentence to the presumptive sentence (that is, there is *no* "determinate departure"), the "400%" rule is inapposite. The ultimate result is that the "shift-to-I" and "200%" rules have no direct application to dangerous offender sentences and are implicated only derivatively if a trial court imposes a dangerous offender determinate term in excess of the guidelines presumptive sentence.

That understanding comports with the legislature's patent intent. In this instance, more than in most, that intent is manifest from the legislative history. In the wake of *Davis*, the Oregon District Attorneys Association (ODAA)

---

[25] *See Langdon*, 330 Or at 74 ("Although the sentencing guidelines were created as administrative rules, the legislature approved them in 1989, giving them the authority of statutory law."); *State v. Teixeira*, 259 Or App 184, 190, 313 P3d 351 (2013) (applying statutory interpretation methodology to guidelines).

and the Department of Justice (DOJ) proposed changes to the guidelines and the dangerous offender statutes to avoid what they characterized as unworkable and unjust outcomes. As most cogently expressed by Susan Tripp of the ODAA, the 1993 amendments sought to address two overarching concerns.

First, proponents wanted to ensure that dangerous offenders were treated in the same way as offenders who received ordinary departure sentences with respect to determinate sentences, so that dangerous offenders would not categorically become eligible for release before ordinary departure offenders. Under the existing version of ORS 161.737, which designated the grid block presumptive sentence as the determinate term of incarceration for a dangerous offender, dangerous offenders became eligible for release before nondangerous offenders who received departure sentences under the guidelines. As Tripp explained, the amendment to ORS 161.737(2) was intended to make determinate dangerous offender sentences "compatible with the guidelines":

> "The reason that we picked 200 percent, two times the presumptive term, as the space where the judge could make a decision to either sentence the person to the presumptive term and they would be reviewed after that or sentence the person to twice that is to make dangerous offender an equal, or make sense with the guidelines, the guidelines say that a person can be sentenced to 200 percent of the presumptive term. So it seemed to us when we were writing this that it was unjust that a [dangerous offender] could get review in half the time that a person that was arguably less dangerous could, a straight departure person, so a straight departure offender who got a 200 percent sentence … could be serving twice as much time as a quote unquote dangerous offender."

Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 9, 1993, Tape 16, Side A (statement of Susan Tripp, ODAA).[26] The

---

[26] The amendments to ORS 161.737, OAR 213-008-0007, and OAR 213-012-0020 were originally introduced as part of House Bill 2483, but were later moved to HB 2478. Tape Recording, Senate Committee on Judiciary, HB 2478 and HB 2483, June 11, 1993, Tape 190, Side A.

amendment of ORS 161.737(2)—affording trial judges the discretion to impose a determinate sentence of "no less than the presumptive incarceration term and no more than twice the maximum presumptive incarceration term"—achieved that release eligibility equivalency goal by allowing the same range for determinate dangerous offender sentences as would be available for an ordinary upward departure sentence.

The legislature's second objective was to abrogate *Davis*'s holding that indeterminate dangerous offender sentences were subject to the guidelines' consecutive sentencing rules, including the "400%" rule—a result that, according to the bill's proponents, left prosecutors with "no reason to seek a dangerous offender sentence." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 9, 1993, Tape 16, Side B (statement of Eric Wasmann, DOJ).[27] The holding in *Davis*, which permitted "the 200 percent rule[28] [to] be construed against the 30 years," crippled the efficacy of the dangerous offender sentencing scheme. House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 2, 1993, Tape 11, Side B (statement of Susan Tripp, ODAA).

The new exceptions to ORS 161.737(2) and OAR 213-008-0007(3) were designed to roll back *Davis* by taking "the 30 year sentence * * * out of the sentencing guidelines," including consecutive sentencing caps, so that indeterminate dangerous offender sentences could, and would, run consecutively without adjustment or limitation. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 2, 1993, Tape 12, Side B (statement of Susan Tripp, ODAA).

---

[27] *See also* Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 2, 1993, Tape 11, Side B, Tape 12, Side B (statements of Eric Wasmann, DOJ, Holly Robinson, Committee Counsel, and Susan Tripp, ODAA).

[28] To be clear, Tripp's use of the term "200 percent" was not a reference to the "200%" rule set out in OAR 213-012-0020(2). She was referring to the fact that a departure sentence is limited to twice the presumptive maximum sentence under OAR 213-008-0007(3), which, as previously explained, is generally referred to, perhaps somewhat confusingly, as the "400%" rule.

In sum, the 1993 amendments were intended to ensure that (1) dangerous offenders were treated the same as ordinary departure offenders for *determinate* sentencing purposes, including limits on cumulative determinate dangerous offender sentencing, but (2) such offenders were subject to much longer individual and cumulative indeterminate sentences than had been possible under *Davis*. Tripp's presentation of that second issue to the committee is particularly instructive with respect to the interplay between those two problems and the intended scope of their proposed solutions.

Tripp began with a hypothetical example of the *Davis*-created consecutive indeterminate sentencing problem:

> "We're still dealing \* \* \* with the interrelation between the guidelines and the dangerous offender statute. \* \* \*. Again, the Court of Appeals has said that these caps that are set by these sentencing guidelines apply to dangerous offenders. In this [hypothetical] case we're dealing with consecutive sentences, sentences that are set to run one right after the other. And there is a cap on those sentences of 400 percent—four times the presumptive gridblock. So [for example] we go to a Rape 1 and the person is an A-9, the maximum presumptive term would be 72 months. If they committed more than one of those, and the judge wanted to run those consecutive, this is a bad person, the total consecutive sentence, under departure, that they could get is 288 months, 4 times 72. That's for sentencing a number of sentences in a row \* \* \*."

House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2483, Feb 2, 1993, Tape 12, Side B (statement of Susan Tripp, ODAA).

Continuing to the proposed solution—the exceptions—Tripp explained that HB 2478 was designed to exempt indeterminate dangerous offender sentences but—critically here—would *not* affect the guidelines' application to the determinate parts of such sentences:

> "The dangerous offender statute, since the 400% rule applies, you have to determine whether or not the presumptive multiplied times four will give you enough time in order

to sentence the person as a dangerous offender. This is the hardest to explain. In this case 360 months is dangerous offender, right, the 30 years. That itself is more than the 288 months, so you could never have a consecutive sentence involving dangerous offender because it would always violate the 400% rule. What we propose is that you change the statutes so that you could sentence the defendant up to 60 years, run dangerous offender sentences consecutively, *and that the required term would be up to, as in the guidelines,* up to 288 months."

*Id.* (emphasis added).

Then, addressing the intersection of the proposed changes, Tripp reiterated that consecutive sentencing rules, including the "400%" rule established by OAR 213-008-0007(3), would not apply to an indeterminate dangerous offender sentence but would apply to the determinate portion of that sentence.

"Basically the situation as it stands now is that under a dangerous offender the sentence not only the 30 year sentence but also the presumptive sentence has to come within the 400 percent cap. So as it currently stands now, whatever grid-block you pick someone to be in, multiply that times four, if that's their primary offense, the highest and worst offense, the whole rest of their consecutive sentences has to come into less than four times that. *And what we are saying is that should apply to the review period,* that that person should come up for review at four times that amount, but that they should not necessarily be just let out, *that they should be held to the same standard as someone who is sentenced under the guidelines who is probably not as bad an offender.* That they should be held to the same standard, have to go through at least as much time as this not-as-bad offender, and then, be reviewed for release after that period of time."

*Id.* (emphasis added).

That explanation of the amendments, which is consistent with, and uncontroverted by, any other legislative history evidence, including the statements of committee members and committee counsel, makes it clear that the legislature intended to exempt indeterminate dangerous

offender sentences, *but not determinate ones*, from the "400%" rule of OAR 213-008-0007(3).

Given that understanding and given the trial court's imposition of a 240-month determinate sentence on Count 1, as the primary offense,[29] the maximum total determinate sentence it could lawfully impose was 420 months, calculated as follows:

Count 1: 240 months (departure from 130-month presumptive maximum based on grid block 10-A)

Count 4: 36 months (maximum departure available for 18-month presumptive maximum, based on grid block 8-I)

Count 7: 72 months (maximum departure available for 36-month presumptive maximum, based on grid block 9-I)

Count 8: 72 months (maximum departure available for 36-month presumptive maximum, based on grid block 9-I).

Because the 594-month determinate sentence that the trial court imposed exceeded that legal limit, we reverse and remand for resentencing.

F. *Remaining Assignments of Error*

In his seventh assignment of error, defendant argues that the trial court erred in imposing an increased sentence following his successful appeal, alleging due process and state constitutional *ex post facto* violations, and seeking ORAP 5.45(1) "plain error" review of the latter argument, which is unpreserved. Our disposition obviates the need to consider those arguments. *See* ORS 138.222(5)(a) ("If the appellate court determines that the sentencing court * * * committed an error that requires resentencing, the appellate court shall remand the entire case for resentencing. The sentencing court may impose a new sentence for any conviction in the remanded case.").

Finally, in supplemental briefing, defendant assigns error to the imposition of departure sentences based on two contentions, both of which are premised upon defendant's assertion that enhancement factors are material elements

---

[29] The trial court could have, but did not, impose a total of 260 months (*i.e.*, 130 months doubled) on that count.

of an offense. First, defendant argues that Article VII (Amended), section 5, of the Oregon Constitution and the "open courts" clause of Article I, section 10, of the Oregon Constitution require enhancement factors to be "submitted to the court in a formalized pleading or otherwise be made part of the public record," alleging a jurisdictional defect for lack of "judicial oversight" of the process. Second, he argues that Article I, section 11, of the Oregon Constitution and Article VII (Amended), section 5, require enhancement factors to either be pleaded by indictment or found by a grand jury.

Defendant's first, "open courts" argument is unpreserved; it was never raised before the trial court. In any event, both of his supplemental arguments fail on their merits under *State v. Reinke*, 354 Or 98, 104, 309 P3d 1059, *adh'd to as modified on recons*, 354 Or 570, 316 P3d 286 (2013) (upholding *State v. Wagner*, 305 Or 115, 752 P2d 1136 (1988), and related decisions, reasoning that, "as a matter of state constitutional law, the legislature defines the elements of the offense that must be pleaded in an indictment and * * * as a matter of legislative intent, a crime does not include sentence enhancement facts"; holding that the jury trial, notice, and grand jury provisions of Article I, section 11, and Article VII (Amended), section 5, do not require that enhancement facts be alleged by indictment, nor do they require the grand jury to find or plead sentence enhancement facts).

Remanded for resentencing; otherwise affirmed.