Argued and submitted December 7, 2022, affirmed April 26, petition for review denied August 31, 2023 (371 Or 332)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ELISHA DAWN SEVERSON,
*Defendant-Appellant.*

Marion County Circuit Court
20CR12073; A175640

529 P3d 302

Defendant appeals her convictions after a jury trial for unlawful use of a weapon (UUW), ORS 166.220, and menacing, ORS 163.190. She argues that the state presented insufficient evidence to prove either charge, and, therefore, that the trial court erred by denying her motions for a judgment of acquittal on both counts. *Held*: Given the entire record, a jury could properly conclude that the state met its burden on each of the elements of the crimes of UUW and menacing. The trial court did not err.

Affirmed.

Deanne L. Darling, Senior Judge.

Brett J. Allin, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

Defendant appeals her convictions imposed by judgment after a jury trial for unlawful use of a weapon (UUW) (Count 1) and menacing (Count 2). ORS 166.220;[1] ORS 163.190.[2] She assigns error to the trial court's denial of her motions for judgment of acquittal as to both counts, arguing that the state presented insufficient evidence to prove either charge. We conclude that the evidence was legally sufficient to support the trial court's denial. We affirm.

We review the denial of a motion for a judgment of acquittal (MJOA) to determine "whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994), *abrogated on other grounds by State v. Mills*, 354 Or 350, 312 P3d 515 (2013). We give the state the benefit of reasonable inferences which "need not inevitably follow from the established facts; rather, if the established facts support multiple reasonable inferences, the jury may decide which inference to draw." *State v. Miller*, 196 Or App 354, 358, 103 P3d 112 (2004), *rev den*, 338 Or 488 (2005).

Defendant moved into A's house with her four-year-old son while she and A were involved in a romantic relationship. That relationship ended and the events underlying the criminal charges against defendant occurred one evening as she was in the process of moving out of A's home. While speaking in the garage that evening, defendant accused A of molesting her son and spraying him with bug spray. A denied the allegations, and defendant became angry. A left the garage to go to his bedroom. Defendant followed A into his room to question him further, after which she went to

---

[1] ORS 166.220 states, in part:

"(1) A person commits the crime of unlawful use of a weapon if the person:

"(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015."

[2] ORS 163.190(1) states:

"A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serous physical injury."

the front door of the house, opened it, and yelled that the neighbors "live next door to molesters." A neighbor reported the disturbance to the police, who responded at 8:16 p.m. and spoke with A, who climbed out through his bedroom window to speak with them. The responding officer left without making an arrest.

A reentered the house and defendant, still upset, threatened to hurt A and his dog. A returned to his bedroom with his dog and locked the door. A then heard banging noises coming from the kitchen, and he started an audio recording on his phone. Defendant was speaking with her son, assuring him that no one would hurt him and talking to him about "Thor."[3] Based on defendant's references to Thor as reflected in the following exchange with her son, A thought that the banging noises were from a hammer and that defendant was threatening to harm him with the hammer:

"[DEFENDANT]:   * * * they won't see the light of day, I can promise that this time.

"[DEFENDANT'S SON]:   Yeah.

"[DEFENDANT]:   Physical violence is the only option now—

"[DEFENDANT'S SON]:   And you're going to fucking pay.

"[DEFENDANT]:   Yeah, they're going to fucking pay. Be the last time they come near one of mine.

"* * * * *

"[DEFENDANT]:   Okay. Like Thor.

"[DEFENDANT'S SON]:   Yep—

"[DEFENDANT]:   When I call for it, you bring it to me.

"[DEFENDANT'S SON]:   Yep.

"[DEFENDANT]:   But nobody's going to do anything, they're a bunch of fucking pussies, that's what [A and his family] do best is some pussies.

---

[3] "Thor: the Norse god of thunder, weather, and crops." *Webster's Collegiate Dictionary* 1301 (11th ed 2003). We understand defendant's and her son's references to Thor to be to the popularized, hammer-wielding superhero in *The Avengers* (Marvel Studios 2012).

"*****

"[DEFENDANT'S SON]:   And [A] doesn't care about anything.

"[DEFENDANT]:   No.

"[DEFENDANT'S SON]:   And his friends, he doesn't care about anything.

"[DEFENDANT]:   Nope.

"[DEFENDANT'S SON]:   Himself. But we'll beat his ass (unintelligible)—

"[DEFENDANT]:   Yep, and I'm going to use it. I'm going to use it, show him that mama's bite is just as big as my fucking bark ***.

"*****

"[DEFENDANT]:   —because it's going to be that calm, it's going to be that calm before the storm and I'm just going to reach out and bludgeon them right in the fucking head when their eyes are closed, huh? Because that's how mama works, she's good at being sneaking in the dark, rather than fucking everybody else—

"*****

"[DEFENDANT'S SON]:   And nobody even cares about me.

"[DEFENDANT]:   Don't, not my shelf, no, you can hit anything else, but don't hit our stuff, we don't want to break our stuff. You can break anything else. The house, whatever."

A called 9-1-1 and reported that defendant was hitting his house with a hammer and threatening him with it. The police returned and arrested defendant. There was no damage done to the house itself, but the officers and A did find a "relatively large cast-metal meat tenderizer" within a few feet of A's bedroom door near a garbage can that had been damaged. A never saw defendant with the meat tenderizer, but he stated that he had not left it near his bedroom door.

Defendant first assigns error to the trial court's denial of her MJOA as to the UUW charge because the

state failed to prove that defendant intended to either use a weapon to inflict injury or to threaten immediate harm or injury. ORS 166.220 provides, in part, that:

"(1)   A person commits the crime of unlawful use of a weapon if the person:

"(a)   Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015."

"Use" for purposes of the UUW statute includes the "employment of a weapon to threaten immediate harm or injury." *State v. Ziska/Garza*, 355 Or 799, 811, 334 P3d 964 (2014). "'Possess' means to have physical possession or otherwise to exercise dominion or control over property," which includes constructive possession. ORS 161.015(9). Under its "possession theory" of UUW, the state had to prove, beyond a reasonable doubt, that defendant "possessed the [weapon] with the intent either (1) to employ the [weapon] to inflict harm or injury or (2) to employ the [weapon] to threaten immediate harm or injury." *State v. McAuliffe*, 276 Or App 259, 265, 366 P3d 1206, *rev den*, 359 Or 847 (2016).

Defendant argues that the state failed to present evidence to allow a nonspeculative inference that defendant intended to use the meat tenderizer to injure A or to threaten him with immediate injury. That is so, according to defendant, because there was no evidence presented that she personally possessed the tenderizer or attempted to get into the same room as A, and because her statements about physical force were "hyperbolic." Defendant concedes that the state presented "at least some evidence to allow a rational inference" that she constructively possessed the meat tenderizer when the state offered the recorded conversation in which she directed her son: "When I call for it, you bring it to me." She contends, though, that despite her constructive possession of the meat tenderizer, the state offered no evidence that she had any intent to use it against A. She argues that she took no steps to enter the same room as A or to otherwise place him in the "zone of danger." According to defendant, unless some modicum of speculation is employed, the evidence would permit an inference of nothing more than mere "bluster" on her part.

We do not agree with defendant's assessment of the evidence. When viewed in the light most favorable to the state, as required by our standard of review, a reasonable jury could conclude that defendant had constructive possession of the meat tenderizer through her son and that she was exercising dominion and control over it when she made these statements to her son within earshot of A:

- "[T]hey won't see the light of day, I can promise that this time."

- "Physical violence is the only option now."

- "[T]hey're going to fucking pay."

- "[O]ur bite is just as big as our bark."

- "I'm going to use it, show him that mama's bite is just as big as my fucking bark."

- "I'm just going to reach out and bludgeon them right in the fucking head when their eyes are closed, huh? Because that's how mama works, she's good at being sneaking in the dark, rather than fucking everybody else."

Understood in the context of defendant's references to "Thor," which A understood to be references to a hammer, the banging noises that A heard while defendant made those statements, and defendant's direction to her son to bring it to her when she calls for it, a reasonable jury could conclude that defendant had the necessary intent.

We have previously reviewed the denial of MJOAs on the issue of intent in the context of menacing and UUW convictions. On the question of intent for UUW, there are two cases that are particularly helpful to us here. In *McAuliffe*, we affirmed a UUW conviction where the evidence was that the defendant had repeatedly called 9-1-1 about a plane flying low over his property, told the dispatcher that he was sitting with a shotgun, admitted that he had serious thoughts about shooting at the plane, and held up a shotgun shell to the pilot as he flew by. 276 Or App at 260-61. That there was also evidence that the defendant did not fire or aim the shotgun at the plane did not change our determination that the record was sufficient to support the requisite intent for UUW. *Id.* at 266.

In *State v. Garibay*, 307 Or App 722, 732, 478 P3d 1006 (2020), which arose from a gang-related shooting, we concluded that the trial court erred when it denied an MJOA on one of the UUW counts, and we reversed that conviction. The evidence produced by the state in that case was that the defendant had gotten out of his truck with a gun during a fight between gang members and shot M in the foot. *Garibay*, 307 Or App at 725. We concluded that there was insufficient evidence "to allow a reasonable inference that he [] intended to use the gun against F[,]" and we reversed. *Id.* at 730. The state failed to "prove that [the] defendant intended to use a dangerous or deadly weapon to *** threaten immediate harm or injury to the specified victim." *Id.* at 732. We distinguished *Garibay* from *McAuliffe*, because in *McAuliffe*

> "the only person who the defendant could have intended to use the shotgun against was the pilot, and the evidence—including what the defendant said to the airport operations manager, the 9-1-1 dispatcher, and the police officers—was sufficient to allow an inference that he intended to use it, either to harm the pilot or to threaten him."

*Id.* at 730.

This case is more like *McAuliffe* than *Garibay*. Defendant made repeated threatening statements directed at A that were paired with references to a hammer and banging noises. A meat tenderizer and damaged garbage can were found near A's bedroom door. A reasonable factfinder could infer from defendant's behavior and statements that she intended to threaten A with the meat tenderizer. That a jury might reasonably have reached a different conclusion is beside the point. On appeal, "our task is not to weigh the evidence, it is only to determine whether there was legally sufficient evidence to support the challenged conviction." *McAuliffe*, 276 Or App at 266. The evidence here was legally sufficient to support the UUW conviction.

Defendant also assigns error to the trial court's denial of her MJOA as to the menacing count. She argues essentially that the state's evidence establishes nothing more than that she made a series of "empty threats," and "empty threats to inflict serious injury" are not sanctionable as menacing. *State v. C. S.*, 275 Or App 126, 130, 365 P3d

535 (2015). "A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury," and "the threatened harm must be imminent and serious." ORS 163.190(1); *State v. Garcias*, 296 Or 688, 699, 679 P2d 1354 (1984). "[T]he menacing statute does not reach communications protected either by the constitution or by common law privileges," rather, speech only constitutes menacing when "the threatened injury is 'near at hand,' 'impending,' or 'menacingly near.'" *Garcias*, 296 Or at 700; *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 695-96, 17 P3d 535 (2000).

Three cases are particularly helpful to the question of whether verbal threats or expressive conduct meet the imminency requirement for menacing. In *C. S.*, a juvenile delinquency case, we agreed that threats made by the accused youth against other students did not qualify as imminent, and we reversed jurisdiction. 275 Or App at 128. The youth had told classmates they were "'going to die'" and that he would kill them, he made a list of their names and described how they would die, and he "would draw his finger across his throat as he walked past them in the hallways." *Id.* at 128-29. We concluded that the youth's threats lacked imminence because, although they created fear of future harm, there was nothing in the youth's statements or expressions to imply that the harm was imminent. *Id.* at 133-34.

In *Dompeling*, another delinquency case, we affirmed jurisdiction where there was evidence that the accused youth, while upset with her mother, told her, "I could stab you right now," and "I thought about doing it while you were in your sleep." 171 Or App at 694. Use of the phrase "right now" added a temporal connection and, given that it was 8:00 p.m. when the youth threatened to stab her mother "in her sleep," the threats were "sufficiently near at hand to be imminent." *Id.* at 696.

Finally, we turn to our recent opinion in *State v. Hejazi*, 323 Or App 752, 524 P3d 534 (2023). The defendant in *Hejazi* had three encounters with R, a defense attorney, at the Eugene Municipal Court. *Id.* at 755. In the first, the

defendant asked R if he would speak with him about his case. *Id.* R did not know the defendant, but he agreed to speak with him after he finished speaking with his clients. *Id.* The defendant told R that he was "going to skin [him] alive." *Id.* A week later, the defendant crossed the street toward R near the courthouse, but when R ignored him, the defendant told him "I could hit you right now" and then said, "I'm going to kill you and your family." *Id.* at 755-56. Finally, inside the courthouse a few hours later, R saw the defendant come into the courtroom and point at him before leaving. *Id.* We determined, after comparing the facts of that case to both *C. S.* and *Dompeling*, that the record was insufficient to prove imminency. *Id.* at 758. The threats by the defendant in *Hejazi* lacked any specific temporal indication, and the "defendant's physical actions did not create a situation supporting an inference that the serious harm was imminent" because the defendant walked quickly away from R following his threat. *Id.* Also, when the defendant told R he could hit him "right now," it was before he threatened to kill him, and was "not a threat of serious personal violence" as in *Dompeling*, but was instead more like the threats made by the youth in *C. S. Id.*

This case is most like *Dompeling*. Defendant's statements came on the heels of the conversation in which she directly accused A of molesting her son and then shouted that same accusation out the front door to the point that a neighbor called the police. She spoke within earshot of A's room where she had just left him. Defendant said that physical violence was her only option, that she would use it, and that she would show him that her bite was as big as her bark. She directed her son to bring the meat tenderizer to her when she asked for it. All the while, A could hear a loud banging that sounded like a hammer. Defendant said that it would be the last time A would get near one of hers and that she would "reach out and bludgeon" him when his eyes were closed, because that is how she works best—in the dark. A reasonable factfinder could infer from that evidence that defendant was intentionally trying to place A in fear of imminent serious physical injury. Her words amounted to threats of imminent harm. Defendant's reference to bludgeoning A when his eyes were closed was made in the

evening sometime between 8:16 p.m., when the police first responded, and 9:00 p.m., when the police returned. That added the necessary temporal component from which a jury could infer that defendant intended to do so that night when A went to sleep. As in *Dompeling*, we conclude that a threat made in the evening about violence that will occur when the person being threatened is asleep is "sufficiently near at hand to be imminent." 171 Or App at 696.

Defendant further argues that her conduct did not make her threats imminent, because she was on the other side of a locked door, and she did not attempt to open it. But this case is not like *Hejazi*, where we concluded that the defendant's physical behavior did not support "an inference that the serious harm was imminent" because the defendant walked quickly away from R after making the threat. 323 Or App at 758. Here, defendant did not threaten a virtual stranger on a public street followed by immediate retreat. She threatened A in his home, within feet of his bedroom, while directing her son to bang the meat tenderizer, immediately after accusing A of molesting her son. She did not retreat. Her behavior, paired with her statements, supports a reasonable inference that the threats of harm were imminent. And, again, the fact that a jury might reasonably have reached a different conclusion is beside the point. Given the entire record before it, a jury could conclude that the state met its burden on each of the elements of the crime of menacing and, therefore, it was up to the jury to reach the verdict it reached.

Affirmed.