754 December 28, 2023 No. 684

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANDREW ANDERSON,
*Defendant-Appellant.*
Deschutes County Circuit Court
19CR28984; A177245

En Banc

Beth M. Bagley, Judge.

Argued and submitted December 22, 2022, resubmitted en banc September 25, 2023.

Per C. Olson argued the cause for appellant. Also on the briefs were Megan E. McVicar and Hoevet Olson, PC.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Chief Judge, and Ortega, Egan, Tookey, Shorr, Aoyagi, Powers, Mooney, Kamins, Pagán, Joyce, Hellman, and Jacquot, Judges.

MOONEY, J.

Affirmed.

Mooney, J. filed the opinion of the court in which Lagesen, C. J., and Egan, Shorr, Powers, Kamins, Joyce, and Hellman, JJ., joined.

Aoyagi, J., dissented and filed an opinion in which Tookey, J., joined, and in which Pagán,and Jacquot, JJ., joined in part, and in which Ortega, J., separately joined in part.

**MOONEY, J.**

A jury found defendant guilty of two separate crimes involving the same victim, based on distinct sets of facts that occurred on different days. Defendant appeals from the judgment of conviction that was thereafter entered against him for each of those crimes: kidnapping in the second degree, ORS 163.225, and menacing, ORS 163.190(1), both of which constituted domestic violence, ORS 132.586(2).

Defendant and the victim, J, moved to Bend from California in 2014 to start a legal marijuana business. They were married in 2015. The marijuana business was successful; the marriage was not. Several days after the last of the events that formed the basis of the jury's guilty verdicts, J moved to California to be with her parents. She sought a restraining order against defendant in that state and filed for legal separation. Defendant, in turn, filed for divorce in Oregon. The events that are the subject of this criminal proceeding came to light through those legal proceedings.

## I.   KIDNAPPING IN THE SECOND DEGREE

### A.   *The First Assignment: Denial of MJOA*

Defendant first assigns error to the trial court's denial of his motion for judgment of acquittal (MJOA) arguing that the evidence would not support a verdict against him on the charge of kidnapping in the second degree. ORS 136.445. We review the denial of an MJOA "in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). If the evidence is sufficient to support the jury's verdict against defendant, then we are required to affirm it. *Id.*

### 1.   *The facts.*

The events giving rise to the kidnapping charge occurred early in the morning on a day in December 2016 or January 2017. Defendant approached J in the master bedroom of their home. Given that it was winter in central Oregon with an outdoor temperature of 20 degrees

Fahrenheit, we think it reasonable to infer that the home was heated. J was lying on her side of the bed in her bathrobe and underwear and was either under the bedsheets or sitting on top of them. Defendant ordered J to "[g]et out of the room." When J did not comply, defendant grabbed her by the hood of her robe and pulled her off of the bed and onto the floor.

Defendant dragged J, on her back, by the hood of her robe, approximately 50 linear feet: across the bedroom and then through the bedroom door, down the hallway, through the foyer, over the door jamb and out the front door of the house, down wooden stairs, and into the front yard where he yanked her robe from her body and left her alone in the yard, exposed to the elements, in the snow and ice that had accumulated in the yard. After removing J's robe, defendant went back inside the house, locked the door, and then physically held the door closed.

After a few minutes, J remembered that her car was unlocked and that there was a garage door opener in it. She was, therefore, able to enter the garage and regain access to the house from there.

2. *The kidnapping statute.*

The state charged defendant with kidnapping in the second degree under ORS 163.225(1)(a), which provides:

"(1) A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person:

"(a) Takes the person from one place to another[.]"

To establish the charged crime the state was, thus, required to prove three elements beyond a reasonable doubt:

1. That defendant took J from one place to another (the asportation element),

2. Without J's consent, and

3. With the intent to interfere substantially with J's personal liberty (the intent element).

Because the state charged the kidnapping offense as involving domestic violence, it was also required to prove domestic violence as an element of the offense. ORS 132.586(2).[1]

Defendant argues that the state's evidence fell short on both the intent element and the asportation element. As to the intent element, he contends that "there was no evidence that would allow the jury to find that he intended either to move [J] a substantial distance or to confine her for a substantial period of time[.]" As for the asportation element, he claims that "the evidence did not establish movement to a qualitatively different place or that th[e] movement was not merely incidental to the commission of another offense." We take the elements in turn, beginning with the asportation element, because defendant's intent is relevant only if the evidence supports that he took J from one place to another.

3. *The asportation element.*

We determine whether there was sufficient evidence for the jury to conclude beyond a reasonable doubt that defendant took J "from one place to another" by considering the distance that he moved her, and whether that movement operated to limit J's personal liberty and to increase her isolation. *State v. Walch*, 346 Or 463, 475, 213 P3d 1201 (2009). There is no threshold distance beyond which defendant was required to move J to qualify that movement as "asportation" under the kidnapping statute. Indeed, "relatively minimal movement" can satisfy the statutory requirement. *State v. Gerlach*, 255 Or App 614, 618, 300 P3d 193, *rev den*, 353 Or 787 (2013). That is because the essence of kidnapping by asportation is not in the distance traveled, it is in the change of place as a means of limiting the victim's ability to move freely about. We, thus, consider distance taking into account "the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's starting place." *State v. Sierra*, 349 Or

---

[1] ORS 132.586(2) provides:

"When a crime involves domestic violence, the accusatory instrument may plead, and the prosecution may prove at trial, domestic violence as an element of the crime. When a crime is so pleaded, the words 'constituting domestic violence' may be added to the title of the crime."

506, 513, 254 P3d 149 (2010), *aff'd as modified*, 349 Or 604, 247 P3d 759 (2011).

Defendant does not dispute that he moved J approximately 50 feet, from beginning to end. But, in his view, by moving J from a place inside the house to a place outside the house he committed "the opposite" of kidnapping. Exactly what he would call it is unclear, but he would not call it kidnapping because by moving J out of the house, he "left her no more isolated than when she was inside." The dissent goes further and asserts that "locking someone out (rather than in) is the opposite of confining them." 329 Or App at 777 (Aoyagi, J., dissenting). We disagree.

By moving J from a protected setting in which she was warm and clothed with access to heat, electricity, and plumbing, to a setting unprotected from the elements, which were extreme at the time, with no clothing or shoes on or available to enable her to safely get to someone who might help, the jury could rationally infer beyond reasonable doubt that the move isolated J and limited her ability to move freely about. It could reasonably conclude that the place from which defendant moved J and the place to which he moved her were qualitatively different places.

4.   *The intent element.*

Intent is an element of kidnapping distinct from the element of asportation. The state was, thus, required to prove beyond reasonable doubt that when defendant moved J from one place to another, he did so with the "intent to interfere substantially with [her] personal liberty[.]" ORS 163.225(1). "[T]he liberty interest that the statute protects from interference is the interest in freedom of movement ***." *State v. Wolleat*, 338 Or 469, 475, 111 P3d 1131 (2005). "[I]n most cases the question whether the defendant intended to interfere substantially with the victim's liberty will present a question of fact for the jury." *Id.* at 478. *Wolleat* instructs us that the defendant must intend that the interference be something more than movement that is merely incidental to another crime, and that the 15 to 20 feet of actual movement under the circumstances present in that case was not

sufficient to allow an inference that the defendant intended to move the victim a substantial distance. *Id.* at 475.

Unlike *Wolleat*, the record here supports that when defendant moved J from her bed to the front yard, he did so on purpose, not as an unintended consequence of an assault that became mobile. The dissent argues that defendant simply "remov[ed] and exclude[ed]" J from her house—in other words, that he intended to kick her out—and not that he intended to kidnap her. 329 Or App at 777-78 (Aoyagi, J., dissenting). But isolation, control, and distance—like kidnapping—are not two-dimensional concepts. The dissent focuses on distance as a linear measurement of physical space between two points. But distance is more complex than that. The kidnapping statute requires the state to prove that defendant moved J from one place to another with the "intent to interfere substantially with [her] personal liberty." ORS 163.225(1)(a). Importantly, the word "distance" is not in the kidnapping statute. Evidence of distance—and of confinement—is certainly relevant to whether a defendant interfered with a victim's personal liberty, but we are aware of no authority that limits evidence of intent to those things. Evidence of dragging someone 50 feet, without more, is very different than evidence of dragging someone 50 feet from a warm bed into an icy yard and leaving them there unclothed in 20-degree weather, and then locking them out. The essential question is not how many inches, feet, or miles defendant intended to move J. The question is whether defendant intended to substantially interfere with J's personal liberty. The distance that he planned to move J, and the distance that he actually moved her, are relevant to his intent, but not dispositive.

It is true that defendant moved J out of the house rather than into it, but the surrounding circumstances support that in doing so he continued to exert control over J's personal liberty and that he did so by design. It is, in fact, those circumstances that support the conclusion that defendant intended to substantially interfere with J's personal liberty by moving her out of the house and into below-freezing weather, with no clothing beyond her underwear, and locking the door behind her. Defendant left J in a situation where just asking for help would be (1) humiliating, because

she was virtually naked, and (2) difficult, given the extreme weather conditions and her lack of shoes and clothing. Those circumstances made J's exclusion from the house more confining than if she were inside the house, and they support the reasonable inference that that is what defendant intended. Given that the evidence supports that reasonable inference, we are not at liberty to disturb the jury's verdict.

B. *The Second, Third, and Fourth Assignments: Instructional Error*

We turn to defendant's second, third, and fourth assignments, all of which concern defendant's specially requested jury instruction on the intent element of kidnapping in the second degree. Defendant requested that instruction at three different points in the trial: after the state's objection to defendant's closing argument, after the state's rebuttal argument, and in conjunction with an answer to a jury question about the intent element of kidnapping. Defendant assigns error to the trial court's denial of each of those requests.

We review "a trial court's refusal to give a requested jury instruction for errors of law" keeping in mind that "[a] criminal defendant is entitled to have the jury instructed in accordance with his or her theory of the case if the instruction correctly states the law and there is evidence to support giving it." *State v. McNally*, 361 Or 314, 320, 392 P3d 721 (2017). A trial court has the obligation to "state to the jury all matters of law necessary for its information in giving its verdict. ORCP 59 B; ORS 136.330 (extending ORCP 59 B to criminal trials). However, a trial court may refuse a request for an instruction when its substance is covered fully by other jury instructions given or when the instruction is not necessary * * * to explain the particular issue or point of law to the jury." *State v. Haws*, 297 Or App 812, 818, 444 P3d 1125 (2019) (internal citations omitted).

Defendant's requested jury instruction states:

"For purposes of Kidnapping in the Second Degree, Oregon law provides that a person has the intent to interfere substantially with another person's liberty if the person acts with the intent *to move the other person a substantial*

*distance* or to confine the other person for a substantial period of time."

(Emphasis added.) Defendant initially requested that instruction when the parties discussed jury instructions, but the trial court rejected it as "somewhat misleading." Defendant again requested the instruction after the state objected to the mention of "substantial distance" by his lawyer in closing argument. Defendant requested the instruction a third time after the state made this argument on rebuttal:

> "[E]arly on in [defense counsel's] argument, he mentioned a substantial distance, and you saw me jump up. I assume he misspoke, and the Court correctly said look to your instructions that are written there. And you will see it is substantial interference. It's not a substantial distance. There's no requirement that [defendant] move [J] *** a substantial distance.
>
> "And so, I assume that [defense counsel] misspoke on that. But there is a requirement that there'll be—that there be substantial interference, and that's where I think the confusion was.
>
> "* * * * *
>
> "Plus, the issue in the kidnapping case is did [defendant] substantially interfere with [J's] liberty. Did he? The defense is saying he didn't. The defense is saying, 'No, he didn't.' The defense is saying it's not an interference—a substantial interference of your liberty to be in your bed, in your underwear, in your home, and have somebody berating and screaming at you and yank you violently out of the bed, grab the hood of your robe, drag you out of the bedroom, through the door, down the hallway, through the foyer, opening the door over the door jamb outside—and yanks you over the door jamb, outside, onto the front porch, into ten feet across the front porch, down the stairs, five feet into the front yard, onto the snow and the ice, deposit your body there, yank your robe off, leave you in your underwear in 20 degrees, close the door that's locked. ***.
>
> "Is that substantial interference or not? And you're the jury, and your job is to decide that. The State wouldn't have presented it to you if we didn't think it was. And you have to decide that."

Defendant argued that the instruction was even more important after that rebuttal argument because the state implied that defense counsel "got the law wrong." And then during deliberation, the jury asked the court for "a better definition of personal liberty" in the context of whether defendant had the intent to interfere substantially with J's personal liberty. Defendant once again requested, unsuccessfully, that his jury instruction be given.

Second-degree kidnapping "has two elements—a physical act and a mental state." *Wolleat*, 338 Or at 473. Taking the victim from "one place to another" is the physical act. ORS 163.225(1)(a). The statute "does not require that a defendant take a victim a specific distance, nor does it require that the distance be substantial." *Wolleat*, 338 Or at 473. Intent to "interfere substantially with another's personal liberty" is the mental state required by ORS 163.225(1). The statute, thus, requires proof that the "perpetrator have the '*intent* to interfere substantially' with the victim's personal liberty to make the malefactor guilty of kidnapping ***." *Walch*, 346 Or at 472 (emphasis in original). As the Supreme Court explained,

> "The drafters' wording of the intent element in ORS 163.225(1) makes it apparent that it was through *that* element that they sought to avoid an over-inclusive definition of second-degree kidnapping. As noted, the only place that the drafters used the word 'substantially' is in describing the extent of interference with the victim's liberty that the defendant must 'inten[d].' And that is where this court has most frequently referred to a 'substantial distance' requirement. That is, for a defendant to act with intent to interfere 'substantially' with another's personal liberty, that defendant need not move the victim a substantial distance or confine the victim for a substantial period of time, but rather 'must *intend* either to move the victim a substantial distance or to confine the victim for a substantial period of time.'"

*Id.* at 473 (emphases in original; citations omitted). Defendant's requested instruction correctly states the law with respect to the intent element of second-degree kidnapping. We understand the trial court's reference to the requested special instruction as "somewhat misleading"

as a reference to the fact that the word "distance" does not appear in the second-degree kidnapping statute and that, although defendant must have intended to move J a substantial distance, his success in doing so is not required and his failure in doing so would not be dispositive. What is required is that defendant "intended to interfere substantially with [J]'s personal liberty, including her freedom of movement[.]" *State v. Worth*, 274 Or App 1, 11-12, 360 P3d 536 (2015), *rev den*, 359 Or 667 (2016) (internal citations, quotations marks, and brackets omitted). Given that the trial court's instructions correctly stated the law on both elements of second-degree kidnapping and given the very real potential for misleading the jury to think that a particular distance is required for either the physical act or mental state elements, the court did not err in declining to give defendant's special instruction.

C.   *The Seventh Assignment: Disproportionate Sentence*

Defendant contends that the trial court erred when it sentenced him to a 70-month mandatory minimum prison sentence on the second-degree kidnapping charge because the sentence was unconstitutionally disproportionate to the conduct for which he was convicted on that charge. We review state and federal constitutional questions of sentence proportionality for legal error. *State v. Rodriguez/Buck*, 347 Or 46, 56-57, 217 P3d 659 (2009).

The Oregon Supreme Court has held that when applying Article I, section 16, of the Oregon constitution, "[i]n order to justify the court in declaring punishment cruel and unusual with reference to its duration, the punishment must be so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *Sustar v. County Court for Marion Co.*, 101 Or 657, 665, 201 P 445 (1921). The Supreme Court later clarified that the standard it articulated in *Sustar* would result in a finding of disproportionality between the punishment and offense "only in rare circumstances." *State v. Wheeler*, 343 Or 652, 670, 175 P3d 438 (2007). It further clarified that its role is not "to second-guess the legislature's determination of the penalty or range of penalties for a crime. However, it is the role of the court

to ensure that sentences conform to requirements that have been in our constitution for 150 years." *Rodriguez/Buck*, 347 Or at 58. In determining whether a penalty is so disproportionate as to "shock the moral sense" of reasonable people, we consider three factors: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *Id.*

Defendant argues that second-degree kidnapping covers a broad range of conduct including aggravating factors that are not present in this case, such as holding a victim captive for many hours or days, using or threatening to use weapons, death threats, robberies or sex crimes committed in the course of kidnapping, or serious physical injury to the victim. Defendant also presented information to the trial court, and now on appeal, of "typical" second-degree kidnapping cases in Oregon that included those aggravating factors. The trial court reviewed that information and found that:

> "[i]f anything, the supporting spreadsheets to the defense's sentencing memoranda indicate that [J]'s harm is exactly within the range that—of harm that is typical for a Kidnapping in the Second-Degree.
>
> "* * * * *
>
> "So, the extent of the depravation of that liberty is consistent and is within the range of the depravations that victims of this offense have typically experienced, based on the small, select sample that was provided to the Court by the defense[.]
>
> "* * * * *
>
> "It is the typical, if not slightly more than typical nature and type of harm experienced and contemplated by the statute."

In reference specifically to whether this sentence would "shock the moral sense of any reasonable person," the trial court noted that if defendant's conduct had been directed to a stranger, rather than his wife, it doubted there would be any discussion about whether the sentence was disproportionate. The court specifically disagreed with the

"unspoken * * * argument that, somehow, it's different if it's your husband, or somehow it's different if it's your wife, or somehow it doesn't matter that this was also [J]'s home too, and she had a right to not be forcibly dragged out of her bed and out of her house."

We find no error in the trial court's analysis. While there were no aggravating factors alleged or proven in this case, the conduct engaged in by defendant was no less egregious, and the harm suffered by J no less severe, than the typical range of conduct and harm in second-degree kidnapping cases generally. We do not agree with defendant's claim that reasonable people would "find it disproportionate to impose the same or similar penalty for defendant's conduct as the penalty imposed on a person who commits" other "Measure 11 offenses" such as second-degree assault or second-degree robbery.[2]

We note, as the trial court did, that defendant had no criminal history. However, the lack of criminal history does not render the sentence unconstitutionally disproportionate to the crime committed. The trial court did not err in finding that defendant's conduct—dragging his wife on her back, by the hood of her robe, almost 50 feet from where she lay in their bed, through the house, down the stairs and into the snow covered grass in 20-degree weather, wearing only her underwear and a robe—was not "minimal." The 70-month sentence does not "shock the moral sense." We will not second-guess the legislature's decision to determine that penalty for this crime. Defendant's sentence was not constitutionally disproportionate to the conduct for which he was convicted on the second-degree kidnapping charge.

## II.   MENACING

Turning to defendant's fifth assignment of error, we review the court's denial of an MJOA on the menacing count by the same standard as we reviewed the kidnapping count.

_____

[2] We have recently acknowledged that "in an age in which long sentences like those imposed under Measure 11 are coming under more scrutiny," it is possible for a sentence to "shock the moral sense of some" without rising to the standard for disproportionality to "shock the moral sense of all reasonable people." *State v. Le*, 327 Or App 129, 141, 534 P3d 1097, *rev den*, 371 Or 715 (2023) (internal brackets omitted).

In the incident giving rise to the menacing charge, which occurred several months after the kidnapping incident, J told defendant that she wanted to leave their home for a few days "so they could have some space." Defendant became angry and, while J stood next to her car on the driver's side, he drilled two holes into the tires on that side and another hole into the car just above the wheel. He also threw a Bluetooth speaker at the car, near to where J was standing, hard enough to leave a dent. Defendant told J that she was "lucky" he threw the speaker at the car and not at her. J remained outside the house for a while because she was afraid of defendant. When she told defendant that she was afraid he was going to kill her, he said: "If I was going to kill you, I'd bury you in the woods and cover your body with lye, and nobody would ever find you."

ORS 163.190 defines menacing as follows:

"(1) A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

Defendant argues that his conduct was not directed at J and only incidentally caused her to fear for her safety. He argues that he did not approach J or brandish the drill at her at any point during the incident, and that his statements to J did not amount to threats of imminent serious physical injury. But defendant drilled holes into J's car and tires and threw an object that left a dent in the car very near to where J was standing, and he did so in direct response to J telling him that she was going to leave for a few days because that statement angered him. A reasonable jury could certainly conclude on that evidence that defendant drilled holes into J's car and threw a speaker at it, as J stood there, to cause her to fear for her own immediate safety. Defendant menaced J by his conduct. It is no different than defendant punching a hole into the wall immediately next to J in an attempt to cause her to fear that she is next. That is the essence of menacing, and a rational jury could so conclude beyond a reasonable doubt.

The verbal statements simply provide additional evidence of menacing. To be sure, "empty threats to inflict serious injury" do not constitute menacing. *State v. C. S.*,

275 Or App 126, 130, 365 P3d 535 (2015). "The threatened harm must be imminent and serious." *State v. Garcias*, 296 Or 688, 699, 679 P2d 1354 (1984). Speech constitutes menacing only when "the threatened injury is 'near at hand,' 'impending,' or 'menacingly near,'" otherwise the communication is constitutionally protected speech. *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 695, 17 P3d 535 (2000). But defendant did not menace J with words. He menaced J as he drilled holes into, and threw a speaker at, the car. His words amplified his conduct and, together, they comprise the totality of the circumstances to consider to determine whether there was sufficient evidence for a jury to find that defendant menaced J. *See, e.g., State v. Hejazi*, 323 Or App 752, 758, 524 P3d 534 (2023) (menacing conviction reversed where the defendant's verbal threat followed by his quick physical retreat did not amount to menacing); *State v. Severson*, 325 Or App 550, 559, 529 P3d 302, *rev den*, 371 Or 332 (2023) (menacing conviction affirmed where there was evidence that the defendant made threats within earshot of the victim's closed and locked bedroom door, shortly after she accused the victim of molesting her son, while sounds of a pounding hammer could be heard and the defendant made threats involving a meat tenderizer).

Defendant's comment that J was "lucky" he took his anger out on her car rather than on her served only to add to the sense of real and imminent danger already conveyed by defendant's conduct. Much like in *Severson*, defendant's "behavior, paired with [his] statements," could lead a rational jury to conclude, beyond a reasonable doubt, that he was threatening J and that his threat was not empty, but was instead a threat of serious and imminent harm. 325 Or App at 559. That is sufficient to support the menacing conviction. The trial court did not err by denying the MJOA on the menacing count.

## III.   THE STATE'S MOTION *IN LIMINE*

Finally, we address defendant's sixth assignment of error challenging the trial court's "granting the state's motion *in limine* to prevent defendant from arguing that [J] alleged defendant abused her in order to gain a tactical advantage in the parties' dissolution." The state responds

that defendant made no offer of proof on that aspect of the court's ruling and that, therefore, he has no basis for appeal. Defendant replies that "an offer of proof was not required because [he] was not proposing to elicit direct evidence that [J] made the allegations of abuse in order to obtain a tactical advantage in the dissolution case." Rather, it was his intent to argue that the jury should infer that J lied "from the context of J's allegations." For reasons that follow, we conclude that the trial court did not err in its ruling, and we reject this assignment of error.

We review the ruling on a motion *in limine* in light of the record that the trial court had before it when it ruled on the motion. *Bank of New York Mellon v. Owen*, 299 Or App 348, 349, 450 P3d 1009 (2019). Whether evidence is sufficient to permit a juror to infer bias or interest of a witness is reviewed for errors of law. *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984).

We begin with these basic principles:

a.   There is no legal error when a court excludes evidence "unless a substantial right of a party is affected, and * * * the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." OEC 103(1)(b).

b.   A trial judge has discretion pursuant to OEC 403 to exclude evidence relevant to bias or interest "once sufficient facts have been established from which the jury may infer that bias or interest," or when the bias or interest "is apparent from the circumstances of the trial." *Hubbard*, 297 Or at 798.

c.   In evaluating a trial court's discretionary ruling under OEC 403, our role is to assess whether the court's decision falls within the range of legally permissible choices. *State v. Gibson*, 299 Or App 582, 588-89, 451 P3d 259 (2019), *rev den*, 366 Or 691 (2020).

d.   Although motions *in limine* were once disfavored, *Nielsen v. Brown*, 232 Or 426, 430, 374 P2d 896 (1962), they are now regarded as an appropriate vehicle "to obtain guidance on how to conduct *voir dire* and opening statements and, more importantly, to prevent the jury from hearing a trial scenario" that they should not hear, and for which,

once heard, there is no adequate way to remedy that they have heard it. *State v. Foster*, 296 Or 174, 183, 674 P2d 587 (1983).

Reviewing the state's motion with those principles in mind, we note first that the state filed the motion after defendant notified it that he intended to argue a defense theory that J "fabricated the allegations contained in the indictment to gain an advantage in the divorce proceedings." The state argued that there was no evidence that would support such a defense theory, but it sought an anticipatory order excluding any "evidence and argument regarding \*\*\* the divorce proceeding." It acknowledged that it would be "fair game" for defendant to ask J "if she thought she would gain an advantage in the divorce by fabricating her allegations against [defendant]" and did not seek to prohibit defendant from asking that question. The state's objection was to defendant suggesting to the jury, through his questioning of J, that she was motivated to make false claims of criminal conduct against defendant because she would gain a tactical advantage in the divorce case by making such claims. We understand the state's concern to have been that, in the absence of evidence that J would, in fact, receive an advantage in the dissolution proceeding by virtue of pending criminal allegations against defendant, defendant should not be permitted to suggest through the language of his lawyer's questions that she would be so advantaged.

There was a lengthy hearing on the motion, although no witnesses were called, and no offers of proof were made. The trial court ruled from the bench as follows:

"All right. Well, I'm going to address some of the specifics of what I'm hearing from defense in terms of potential bias, interest, motive evidence or examination defense wants to conduct.

"\* \* \* \* \*

"I'm going to reiterate that I believe it is appropriate in terms of, you know, trying to establish or elicit testimony from the victim about her potential motive or bias or interest against defendant that she made reports to law enforcement or whatever enforcement agency of, you know, perceived or not infractions or offenses of release agreements

or OLCC licensing agreements or anything along those lines, you know, with the inference being that she has some motive against him.

"I'm not going to permit questioning or argument that suggests that that somehow gives her a tactical advantage in the dissolution.

"So, you can ask about her attempt to resist subpoenas and enlisting the District Attorney's Office to assist her with that. You can ask her about any reports she made about release violations or law violations or administrative violations.

"And, you know, it should go without saying, but the State will also have the opportunity to address that on redirect with her so she can, you know, fully explain those circumstances if she chooses to.

"But suggesting that these things would have given a tactical advantage in the dissolution, I think, is generally inaccurate. But it also does lead to a lot of simply—you know, frankly, complicated and unrelated and irrelevant matters in the dissolution.

"* * * * *

"I'm not aware of any sort of case law suggesting that criminal conduct unrelated to the dissolution action is a circumstance that the Court can consider in making a just and proper distribution of property.

"So, I think it is, in fact, confusing and misleading and prejudicial to suggest that not only did her conduct demonstrate some sort of motive or bias against defendant, * * *, but that they also provided her with some sort of advantage in the dissolution.

"It's that second part that I believe is not consistent with 403, because that does mislead the jury into thinking that it would allow her some sort of tactical advantage.

"* * * * *

"So, motion *in limine* number one is decided as follows. Defense may question victim about the reasons for her fleeing or leaving the area and whether or not outstanding payroll taxes that were owed were any factor in that.

"* * * * *

"Defense may question victim about whether or not she attempted to seek the assistance of the District Attorney's Office or any of their personnel in resisting subpoenas that may have been issued in her domestic relations case.

"Defense may question victim about whether she made any reports to law enforcement agencies, regulatory agencies, or any other entities to report, you know, potential release agreement violations, law violations, or anything along those lines with the purpose of there being some sort of negative consequence for [defendant].

"Defense may question victim about the timing of her report to law enforcement about the facts and circumstances that comprise the current indictment. Defense may not ask the victim or any other witness about the timing of the grand jury presentment.

"Defense may not ask questions or otherwise argue that the victim/complainant, through some of the actions that I've just discussed that I'm going to allow inquiry into, obtained a tactical advantage in the dissolution case.

"* * * * *

"So, unless and until I hear something further and more specific about why and how the domestic relations case should be drawn into this and how any sort of testimony or evidence, you know, would establish a tactical advantage, real or perceived, in the dissolution, that is not an area that I'm going to allow inquiry into.

"So, I'm basing my decision based on the arguments of counsel, their briefing and, you know, what they've provided to me today in terms of the areas of evidence or inquiry that they expect during the trial. That's the Court's ruling on motion number one."

The court's thoughtful ruling was as detailed and clear as the record permitted. The court did not exclude any evidence. At most, it prohibited defendant from making an argument that was not supported by evidence. The court also left the question open to reconsideration should it "hear further and more specific" evidence "about why and how the domestic relations case should be drawn into this" criminal case.

OEC 609-1 provides that "[t]he credibility of a witness may be attacked by evidence that the witness engaged

in conduct or made statements showing bias or interest." That evidentiary principle applies to *evidence*. No offer of proof was made in response to the state's motion *in limine*. Defendant did not offer evidence that J stood to benefit in the divorce case from false accusations of criminal conduct against him in this case. He did not make an offer of proof that J would testify that she thought that she would benefit in the divorce case from false accusations of criminal conduct against him in this case. On that record, the trial court did not err.

Affirmed.

**AOYAGI, J.,** dissenting.

Defendant was convicted of one count of second-degree kidnapping and one count of menacing, based on two separate incidents several months apart.[1] I disagree with the majority that the charged conduct qualifies as kidnapping and menacing as the legislature has defined those crimes. It is important to clearly and accurately delineate the boundaries of those crimes, as they are frequently charged offenses, and kidnapping is a particularly serious offense that the legislature sought to narrow through the current kidnapping statute. In this case, I would reverse both convictions because the evidence was legally insufficient to prove the charged crimes. Accordingly, I dissent.

## KIDNAPPING

Second-degree kidnapping may be committed by asportation ("[t]ak[ing] the person from one place to another") or confinement ("[s]ecretly confin[ing] the person in a place where the person is not likely to be found"). ORS 163.225(1). Defendant was convicted of kidnapping by asportation. That crime occurs when a person, "with intent to interfere substantially with another's personal liberty, and without consent or legal authority, * * * [t]akes the person from one place to another[.]" ORS 163.225(1)(a).

Asportation is the conduct element of the crime. The state must prove that the defendant moved the victim "from

---

[1] Defendant was also charged in connection with two other alleged incidents, but he was acquitted on those charges.

one place to another" within the meaning of the kidnapping statute. ORS 163.225(1). A defendant moves a victim "from 'one place' to 'another' only when the defendant changes the position of the victim such that, as a matter of situation and context, the victim's ending place is qualitatively different from the victim's starting place." *State v. Sierra*, 349 Or 506, 513, 254 P3d 149 (2010).

It is not entirely settled what "quality" renders a place "qualitatively different" from another place. Past case law has focused on the qualities of isolation and ease of control. In *State v. Walch*, 346 Or 463, 475, 213 P3d 1201 (2009), the court explained that a person who is moved a substantial distance is "more likely" to end up in "another" place, but that "another important factor in determining whether the defendant moved the victim 'from one place to another' is whether the movement served to limit the victim's freedom of movement and increase the victim's isolation." There, the defendant moving the victim from her open-air driveway into his car trunk satisfied the asportation element, even though the distance was short. *Id.* at 482. In *State v. Washington*, 266 Or App 133, 139-41, 337 P3d 859 (2014), *rev den*, 356 Or 767 (2015), we relied on *Walch* in holding that asportation could be proved by evidence that the defendant forced the victim from the open doorway of her home, "where she might have been seen by neighbors," upstairs "to a more isolated place at the top of the stairs," which movement "served to limit her freedom and increase her isolation." *But see also Sierra*, 349 Or at 516 (emphasizing that, while it may be relevant that a particular movement "increases defendant's control over the victim, or isolates the victim from the view of others," those considerations "cannot be substituted for the ultimate inquiry whether the victim was moved from one place to another").

Turning to intent, the "intent to interfere substantially with another's personal liberty" is the intent element of the crime. ORS 163.225(1). Any act of forcefully moving or restraining a person against their will would seem to "interfere" with a person's liberty. However, it is well-established by case law what "substantial" interference requires: "[T]he liberty interest that [ORS 163.225(1)] protects from

interference is the interest in freedom of movement," and "for the interference to be substantial, a defendant must intend *either to move the victim a 'substantial distance' or to confine the victim for a 'substantial period of time.'*" *State v. Wolleat*, 338 Or 469, 475, 111 P3d 1131 (2005) (emphasis added); *see also, e.g.*, *Walch*, 346 Or at 473 (same); *State v. Nguyen*, 221 Or App 440, 445, 190 P3d 462 (2008), *adh'd to as modified on recons*, 228 Or App 241, 206 P3d 1219 (2009), *rev den*, 348 Or 669 (2010) (same). The defendant need not *succeed* in moving the victim a substantial distance or confining the victim for a substantial period of time, but the defendant must *intend* to do one or both of those things to commit the crime of kidnapping. *Walch*, 346 Or at 473.

   Importantly, the intent necessary to "kidnap" a person is "separate" and "apart" from the intent to assault, menace, bully, or harass them. *State v. Mejia*, 348 Or 1, 10, 12, 227 P3d 1139 (2010) (describing issue as whether a reasonable trier of fact could "find that, apart from his various assaultive and menacing acts, defendant intended to interfere substantially with the victim's personal liberty" and recognizing the need for evidence of a "separate intent to keep the victim in her apartment and hold her captive"); *see also, e.g.*, *Walch*, 346 Or at 482 (noting that "the legislature took pains to enact a kidnapping statute that would limit 'the separate crime of kidnapping' to situations 'where the detention *or* asportation is *not merely incidental* to the commission of the underlying crime'" (quoting *State v. Garcia*, 288 Or 413, 420, 605 P2d 671 (1980) (emphasis in original)); *State v. Arreola*, 282 Or App 555, 560-61, 386 P3d 214 (2016) (holding that the evidence was insufficient to prove the intent element of kidnapping, where the defendant confined the victim, NS, in a garage for 15 minutes to "scare her," but "that confinement was incidental to the assault" that took place in the garage, and there was no evidence that he "intended to confine NS to the garage for a substantial period of time").

   In this case, defendant disputes the sufficiency of the evidence as to both the asportation element and the intent element of second-degree kidnapping. The majority's asportation and intent analyses significantly overlap.

*See* 329 Or App at 758-61. That is understandable, insofar as it is undisputed that defendant intended to do exactly what he did: get J out of the house by dragging her a little less than 50 feet from the bedroom to the front yard and then locking the front door.[2] However, the intent element of kidnapping is legally distinct from the asportation element. It is the intent element that interposes the requirement of *substantial* interference. Indeed, the intent element in the current kidnapping statute was written as it was precisely to narrow the statute's application, in response to concerns about the overcharging of kidnapping. *See generally Mejia*, 348 Or at 7-9 (discussing history of current statute); *Walch*, 346 Or at 469-74 (same); *Garcia*, 288 Or at 416-21 (same).

I therefore focus on the intent element. That is, I assume for present purposes that the inside of the house and the outside of the house were qualitatively different places, notwithstanding the fact that defendant actually had less control over J outside.[3] *See State v. Murray*, 340 Or 599, 603, 606, 136 P3d 10 (2006) (recognizing the questions of "metaphysics" that the term "place" raises); *see also Walch*, 346 Or at 482 (disagreeing with one statement in *Murray* but adhering to its holding that determination of what constitutes movement from one place to another is "situational and contextual").

To prove that defendant intended to substantially interfere with J's liberty—separate and apart from an intent to assault, harass, or bully her—the state had to prove that defendant "intend[ed] either to move [J] a 'substantial distance' or to confine [J] for a 'substantial period of time.'" *Wolleat*, 338 Or at 475. Although the Supreme Court has alluded to the "possibility" of there being some other way to "substantially interfere" with a person's liberty, *Mejia*, 348 Or at 11-12, neither it nor we have ever identified any

---

[2] The only potential difference between what defendant intended and what he accomplished is that defendant may not have anticipated J getting back into the house through the garage door. Like the majority, I do not consider in my analysis the fact that J found a way back into the house after five to 10 minutes.

[3] The only observation that I will make regarding the asportation element is that, to the extent the majority suggests that whether J was kidnapped might depend on the weather or her attire, I find that approach difficult to reconcile with the statute.

other way, nor do I understand the state to be asking us to announce a new way in this case.

It is undisputed that defendant did not intend to "confine" J at all; indeed, locking someone out (rather than in) is the opposite of confining them. It is also undisputed that defendant did not intend to move J any greater distance than he did. Thus, in the end, what the state had to prove was that defendant intended to move J a substantial distance, and the key legal question is whether a little less than 50 feet is a substantial distance to intend to move someone.

I do not believe it is, nor do I believe that the Supreme Court would conclude that it is. There is no precedent for treating 50 feet, or anything similar, as a "substantial distance" for kidnapping purposes. If defendant had moved J a short distance—such as 50 feet—to "another place" that was more isolated or confined, and the circumstances allowed a reasonable inference that he intended to confine her there for a substantial period of time, that would be sufficient to prove kidnapping by asportation. *See, e.g.*, *State v. Worth*, 274 Or App 1, 12-13, 360 P3d 536 (2015), *rev den*, 359 Or 667 (2016) (stating, in a case where the defendant "moved the victim from a place where she could have more easily escaped or summoned help to a more secluded location," that "proof that a defendant physically restrained the victim, thwarted escape attempts, sought to minimize the risk of discovery, or moved the victim to a place that would better facilitate the defendant's control over the victim" may be probative of the requisite intent for kidnapping). But that is not this case. There has never been a confinement issue in this case. What the state had to prove in this case was that defendant intended to move J a substantial distance.

This case is similar to *Wolleat*. There, the defendant "dragged the victim from one room to another during the course of an assault." 338 Or at 471. Specifically, he pulled her out of bed and dragged her by her hair from the bedroom to the living room, a distance of approximately 15 to 20 feet. *Id*. The Supreme Court held that the evidence was insufficient to prove the intent element of second-degree kidnapping, because there was no evidence that the defendant

"intended either to move the victim a greater distance than he did or to transport her to a place of confinement." *Id.* at 478. The court thus implicitly ruled that 15 to 20 feet is not a "substantial distance." Similarly, here, defendant pulled J out of bed and dragged her by her hair from the bedroom to the front yard, a distance of 50 feet, in the course of assaulting or harassing her. There is no evidence that defendant intended to move her a greater distance or transport her to a place of confinement. If 15 to 20 feet is not a "substantial distance" to intend to move someone, neither is a little less than 50 feet.

Thus, to summarize, it is undisputed that defendant did not intend to confine J at all, let alone for a substantial period of time, and the only evidence regarding his intent to move her is that he intended to move her a little less than 50 feet, which is not a substantial distance. In the absence of evidence that defendant "intend[ed] either to move [J] a 'substantial distance' or to confine [J] for a 'substantial period of time,'" *Wolleat*, 338 Or at 475, the only possible way that defendant could be convicted of kidnapping in this case is if the court is announcing a new, third way to substantially interfere with someone's liberty: by removing and excluding them from a place that they want to be. In my view, such an approach would be inconsistent with the legislative intent. No matter how egregious defendant's conduct was, it was not second-degree kidnapping, as I understand the legislature to have defined that crime.

Having explained why I conclude that defendant was entitled to a judgment of acquittal on the charge of second-degree kidnapping, I will comment only briefly on defendant's second, third, and fourth assignments of error, in which he challenges the trial court's repeated refusal to instruct the jury more completely on the intent element.

I agree with the majority that defendant's requested instruction correctly states the law on the intent element of second-degree kidnapping. *See* 329 Or App at 763. I disagree that the trial court did not have to give that instruction. *See id.* at 764. The jury was instructed that, to prove kidnapping, the state had to prove that defendant "had the intent to interfere substantially with [J's] personal liberty."

Defendant requested a legally accurate instruction on the well-established meaning of "substantial" as used in that phrase. In response, the prosecutor argued that the requested instruction misstated the law—which it did not—and the trial court declined to give it, stating, "I don't believe that that is an accurate statement of the law, or at least I think it's somewhat misleading * * *." Then, during closing argument, the prosecutor argued that defense counsel had misstated the law in referring to "substantial distance" in closing, and he told the jury that "personal liberty" means a person's "freedom of movement," which in turn simply means the "ability to move or not move." Defendant again requested the additional instruction, and the court again said no. Finally, during jury deliberations, the jury asked for a "better definition of 'personal liberty'"—having heard none except the prosecutor's—and the court again rebuffed defendant's request, instead telling the jury only that "the term 'personal liberty' refers to [J's] right to freedom of movement."

The Supreme Court has acknowledged the inherent "ambiguity" in the phrase "intent to interfere substantially with another's personal liberty'" in the kidnapping statute—and how that ambiguity has been resolved through case law:

> "The decision in *Garcia*[, 288 Or at 413] removes some of the ambiguity from the phrase 'intent to interfere substantially with another's personal liberty.' It confirms that the liberty interest that the statute protects from interference is the interest in freedom of movement and concludes that, *in order for the interference to be substantial, a defendant must intend either to move the victim a 'substantial distance' or to confine the victim for a 'substantial period of time.'*"

*Wolleat*, 338 Or at 475 (emphasis added). In short, it is the "substantial" distance that the defendant intends to move the victim, or the "substantial" period of time that he intends to confine the victim, that makes the intended inference "substantial."

The legal meaning of "intent to interfere substantially with another's personal liberty'" was particularly important to the defense theory in this case; the prosecutor

made misleading statements in closing argument regarding the intent requirement for kidnapping; and the jury was clearly unsure as to what the state needed to prove. The requested instruction accurately stated Oregon law and would have ensured that the jury understood its task. It was not confusing or misleading. Under the circumstances, the requested instruction should have been given. The court erred each time that it refused to do so, and that error likely affected the verdict. The instructional error is another reason that I would reverse defendant's kidnapping conviction (although a reversal on that basis would only entitle defendant to a new trial).

## MENACING

Having explained why I would reverse the kidnapping conviction, I next address the menacing conviction.

"A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190(1). "An 'imminent' threat is one that is 'near at hand,' 'impending,' or 'menacingly near.'" *State v. Hejazi*, 323 Or App 752, 757, 524 P3d 534 (2023) (quoting *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 695, 17 P3d 535 (2000)). A non-imminent verbal threat is constitutionally protected speech. *State v. Severson*, 325 Or App 550, 557, 529 P3d 302, *rev den*, 371 Or 332 (2023); *see also State v. Moyle*, 299 Or 691, 703, 705 P2d 740 (1985) (concluding that it is constitutional to convict someone of harassment for "threats which are so unambiguous, unequivocal and specific to the addressee that they convincingly express to the addressee the intention that they will be carried out"). Thus, to prove menacing, the state had to prove that defendant threatened J in a way that would cause an "objectively reasonable person" to fear physical injury that was both "imminent" and "serious." *State v. C. S.*, 275 Or App 126, 133, 365 P3d 535 (2015); *see also State v. Garcias*, 296 Or 688, 699, 679 P2d 1354 (1984) ("[T]he threatened harm must be imminent and serious.").

*Dompeling* and *C. S.* are illustrative as to the imminency requirement. In *Dompeling*, 171 Or App at 694-96, we

held that the youth's statements to her mother at 8:00 p.m. one evening that "I could stab you right now" and that "I thought about doing it while you were in your sleep" could be found to threaten imminent serious physical injury, because "the threat of being stabbed within the next few hours is sufficiently near at hand to be imminent." We reached the opposite conclusion in *C. S.*, where the youth told three classmates that they were going to die and he was going to kill them, including telling one classmate that she would die in three days or else he would stab her with a pencil until she died, and he also drew his finger across his neck when passing them in school hallways. 275 Or App at 128-29. Although an objectively reasonable person could fear future harm, the youth's threats did not imply harm that was "moments away" or otherwise "imminent" enough to constitute the crime of menacing. *Id.* at 133.

In this case, defendant became angry when J told him that she wanted to leave home for a few days, drilled several holes in J's car tires and above the wheel well, threw a speaker at the car hard enough to leave a dent, and told J that she was lucky that he threw the speaker at the car and not at her. Sometime later that night—it is unclear how much later—J told defendant that "you can't do this" to people or their cars, that it was "not okay," and that she was "afraid he was going to kill [her] one day." Defendant responded, "If I was going to kill you, I'd bury you in the woods and cover your body with lye, and nobody would ever find you."

The majority concludes that the act of drilling holes in J's tires and throwing a speaker at J's car meets the statutory definition of menacing. *See* 329 Or App at 767-69. I disagree. Mere proximity to the use of force against an object is not, in and of itself, enough to establish menacing. There must be something about the circumstances that makes it objectively reasonable for the person to fear *imminent, serious physical injury* to their person. ORS 163.190(1); *C. S.*, 275 Or App at 133. That evidence is lacking here. There is no evidence that defendant used the drill or threw the speaker in a manner that itself could have risked causing serious physical injury to J. There is also no evidence, for example,

of defendant holding up another object to throw after telling J that she was lucky he had not thrown the speaker at her, which would bring this case closer to *Severson*, 325 Or App 550.

Finally, as for defendant's statement later the same night—when, in response to J expressing fear that he would kill her "one day," he described how he would dispose of her body if he "was going to" kill her—it is entirely understandable and rational that J would be alarmed and frightened by defendant's behavior, leading up to and including that statement. Indeed, within days, she left him and left the state. But neither the "lucky" statement nor the later statement meet the legal requirements for an imminent threat, even in combination with defendant's conduct in damaging J's vehicle.[4] Any implied threat of future injury was not imminent, *i.e.*, "near at hand," "impending,"' or "'menacingly near." *Hejazi*, 323 Or App at 757 (internal quotation marks omitted). Because defendant's conduct and words did not objectively threaten *imminent*, serious physical injury to J, the state failed to prove the elements of menacing.

In sum, I would reverse both of defendant's convictions based on legally insufficient evidence.[5] I therefore respectfully dissent.

Tookey, J., joins in this dissent.

Pagán and Jacquot, JJ., join in this dissent as to those portions addressing the motion for a judgment of acquittal on the kidnapping charge and the jury instructions on the kidnapping charge.

Ortega, J., joins in this dissent as to the portion addressing the jury instructions on the kidnapping charge.

---

[4] When parties have a history of domestic violence, it is possible that one party may feel at near-constant risk of imminent physical injury, because violence may occur so suddenly or unpredictably. But the menacing charge here was based on a specific incident. Past domestic violence may be relevant context to a threat, but, ultimately, the threat in context must still meet the legal standard. On this record, the evidence was insufficient to prove menacing.

[5] If we reversed defendant's convictions, we would not reach the sixth or seventh assignments of error—regarding a motion in limine and sentencing, respectively—so I do not address those assignments.